Seaboard Industries, Inc. *v.* Monaco, Appellant.

Argued November 11, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

rear-gument refused May 6, 1971.

*John Justin McCarthy,* for appellant.

*Ronald H. Isenberg* and *Bernard J. Smolens,* with them *Isenberg, Goldin & Blumberg,* and *Schnader, Harrison, Segal & Lewis,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, March 18, 1971:

Appellant and another corporate officer were found by the chancellor to have violated their fiduciary duties of loyalty and faithfulness to the corporation they served, Seaboard Industries, Inc., by having diverted a corporate opportunity to their own personal use. They were ordered to file accountings and to return to the corporation all monies received.

Appellant filed an accounting stating he had obtained $14,400 as a result of taking advantage of the corporate opportunity. This amount was contested by the corporation. The chancellor resolved the issue by finding that appellant's actual receipts amounted to $18,500. The other officer was found to owe $188,625.

Appellant does not contest the chancellor's finding that he is accountable to the corporation for $18,500. Rather he appeals from a decree on September 9, 1969 holding him jointly liable for the total sum of $207,125. We affirm.

As appellant does not challenge the basic determination of his having breached his fiduciary duties to Seaboard Industries, we need not set forth in detail the more than 300 separate findings of fact made by the chancellor. However, we will sketch an outline of the

transactions involved and particularly appellant's connections with them.

Appellee, Seaboard Industries, Inc. is a closely held Pennsylvania corporation. Appellant, Albert B. Monaco, served as the Secretary of Seaboard from June, 1963, until February 12, 1964, and was retained as legal counsel for Seaboard from its incorporation in September, 1962, until June, 1965.

On May 25, 1963, Seaboard entered into a written assignment of lease agreement whereby Seaboard acquired the rights to mine, reclaim and remove coal from certain deposits owned by the Blue Ridge Real Estate Company. Thereafter, in September Seaboard and Blue Ridge entered into a lease directly between themselves under which Seaboard was entitled to the same rights, and was to pay Blue Ridge a royalty of 35 cents a ton. The lease was predated May 27, 1963, and was to run for ten years.

Seaboard commenced to reclaim and mine the coal in June, 1963. At that time, John D. Howley was the president. He continued in office until July, 1963, when Walter F. Joachim assumed control and management of Seaboard. Prior to Joachim's becoming president and treasurer, Seaboard's operations had been profitable.

On November 19, 1963, Joachim met with Blue Ridge and stated that the installation of a coal preparation plant at the deposit site was necessary to render the mining and reclamation operation profitable. He also said that a proposal would be submitted to Blue Ridge involving the anticipated change in operations either on the basis of a new royalty fee or else the outright purchase of the coal deposits *by Joachim.*

Later the same day, a Seaboard shareholders' meeting was held. Although Joachim advised those present that he had been in contact with two of the larger coal

producers in the eastern United States, Pagnotti Coal Interests, Inc. and Correale Mining Company, concerning the possibility of erecting a coal processing plant on the land where Seaboard was mining, he made no mention of the negotiations earlier in the day with Blue Ridge. Monaco attended the meeting and, as he had assumed the office of Secretary of the corporation, recorded the minutes. The three other shareholders, comprising seventy-five percent of the voting stock, instructed Joachim to enter into negotiations with Pagnotti for the construction of a plant.

On December 2, 1963, Joachim, with the knowledge and consent of Monaco, submitted to Blue Ridge a written offer to purchase on his own behalf Blue Ridge's interest in the same coal and refuse deposits that were the subject of the May 27, 1963 lease between Blue Ridge and Seaboard. On December 27, 1963, Blue Ridge delivered its letter of intention to sell to Joachim.

Another Seaboard shareholders' meeting was held on January 2, 1964. Although both Monaco and Joachim knew of Blue Ridge's letter of intention, neither informed any of the other shareholders and directors of its existence.

On January 29, 1964, Monaco assisted Joachim in terminating the lease between Blue Ridge and Seaboard and purchasing the coal banks for Joachim individually.

Prior to that time, Joachim and Pagnotti had negotiated concerning the construction of the plant, and Pagnotti had orally agreed to erect the plant and pay *Joachim* a royalty of at least $1.00 per ton. On February 10, 1964, Joachim subleased the right to mine the land to Pagnotti for a royalty of $1.40 per gross ton. Monaco again assisted Joachim with these arrangements.

The next Seaboard shareholders' meeting was held on February 12, 1964. Monaco and Joachim each communicated that they had carried out the instructions received at the November meeting. They stated that Pagnotti was paying a royalty of $1.00 per gross ton, rather than the actual amount of $1.40. They also indicated that instead of paying the entire royalty directly, Pagnotti would pay $.65 per ton to Seaboard and $.35 per ton would be paid to the "owner" of the coal deposits.

At the same meeting Monaco displayed an "agreement" which he had prepared purporting to be a contract between Pagnotti and Seaboard concerning the installation of the plant and the mining of the coal. In actuality, the writing was not a legal agreement, and Seaboard acquired no rights in exchange for the execution of the writing.

Earlier the same day, Monaco had received from Joachim an assignment of $.10 per gross ton of all commercial coal produced from the Blue Ridge deposits then owned by Joachim. Presumably this assignment was a reward for Monaco's services to Joachim in perpetrating the seizure and exploitation of Seaboard's above described corporate opportunity to purchase the Blue Ridge coal banks.

Shortly after February 12, 1964, Monaco billed and received from Seaboard $7,500 for legal services allegedly rendered to Seaboard in connection with all the negotiations between Pagnotti and Seaboard, when in actuality the negotiations had been between Joachim, Blue Ridge, and Pagnotti. However, the chancellor allowed this fee.

In 1965, Joachim leased the mining rights to Correale, and Monaco received approximately $900 per month in royalties after February, 1966. Monaco also assisted Joachim in obtaining the loan necessary to pay

Blue Ridge for the purchase of the coal banks. In fact, Monaco borrowed $18,000 in his own name and turned these funds over to Joachim.

The above partial recitation of the facts clearly demonstrates that during the period in question, the opportunity to purchase Blue Ridge's interest in the coal banks, and the opportunity to acquire the benefit of the Pagnotti agreement and the later Correale agreement were all available to Seaboard. However, due to the deceptive tactics of deliberate concealment and secret negotiations conducted jointly by Monaco and Joachim, these opportunities were wrested from the corporation and converted to the selfish and personal benefit of both Monaco and Joachim.

The controlling principles of equity are well settled. Officers and directors of a corporation are deemed to stand in a fiduciary relation to the corporation. Business Corporation Law, Act of May 5, 1933, P. L. 364, art. IV, §408, as amended, 15 P.S. §1408 (Supp. 1970).[1]

Mr. Justice (later Chief Justice) Horace STERN ably summarized the burdens imposed because of this statutory fiduciary relation particularly with regard to corporate opportunities when he said: ". . . [Officers and directors] must devote themselves to the corporate affairs with a view to promote the common interests and not their own, and they cannot, either directly or indirectly, utilize their position to obtain any personal

---

[1] Section 408, art. IV of the Business Corporation Law, as amended, provides: "Officers and directors shall be deemed to stand in a fiduciary relation to the corporation, and shall discharge the duties of their respective positions in good faith and with that diligence, care and skill which ordinarily prudent men would exercise under similar circumstances."

See *Selheimer v. Manganese Corp. of America*, 423 Pa. 563, 224 A. 2d 634 (1966) for an exhaustive study of fiduciary responsibility under Section 408 prior to amendment. The amendment deleted the words "in their personal business affairs."

profit or advantage other than that enjoyed also by their fellow shareholders: Bird Coal and Iron Co. v. Humes, 157 Pa. 278, 287, 27 A. 750, 752; Porter v. Healy, 244 Pa. 427, 435, 436, 91 A. 428, 431. In short, there is demanded of the officer or director of a corporation that he furnish to it his undivided loyalty; if there is presented to him a business opportunity which is within the scope of its own activities and of present or potential advantage to it, the law will not permit him to seize the opportunity for himself; if he does so, the corporation may elect to claim all of the benefits of the transaction. Nor is it material that his dealings may not have caused a loss or been harmful to the corporation; the test of his liability is whether he has unjustly gained enrichment: Bailey v. Jacobs, 325 Pa. 187, 194, 189 A. 320, 324." *Lutherland, Inc. v. Dahlen*, 357 Pa. 143, 151, 53 A. 2d 143, 147 (1947). Accord, *Higgins v. Shenango Pottery Co.*, 279 F. 2d 46 (3d Cir. 1960) ; *Gamlen Chemical Co. v. Gamlen*, 79 F. Supp. 622 (W.D. Pa. 1948) ; *Rivoli Theatre Co. v. Allison*, 396 Pa. 343, 152 A. 2d 449 (1959) ; *Weissman v. A. Weissman, Inc.*, 382 Pa. 189, 114 A. 2d 797 (1955) ; *Howell v. McCloskey*, 375 Pa. 100, 99 A. 2d 610 (1953) ; see also *Guth v. Loft*, 23 Del. Ch. 255, 5 A. 2d 503 (1939) ; see generally Fletcher, Cyclopedia Corporations §861.1 (rev. ed. 1965) ; Sell, Pennsylvania Business Corporations, §408.4 (1969) ; Note, "Corporate Opportunity", 74 Harv. L. Rev. 765 (1961).

Also, we have no hesitation in applying the corporate opportunity doctrine to a close corporation. See *Weissman v. A. Weissman, Inc.*, supra; Fletcher, Cyclopedia Corporations §861.1 (Supp. 1970).

That Monaco was in a fiduciary relation to Seaboard and that he breached his corresponding duty by diverting corporate opportunities are unquestioned. Monaco challenges only his joint liability for Joachim's gains. However, his position is without merit.

Monaco asserts that there were two separate decrees of liability. Yet, examination of the original decree nisi discloses that both Joachim and Monaco were held accountable. The decree ordered ". . . that Joachim and Monaco return to Seaboard any and all moneys or other consideration which Joachim or Monaco received from Pagnotti, Correale or any other third parties for coal removed or to be removed from the banks . . . ." *Seaboard Industries, Inc. v. Joachim,* 45 Pa. D. & C. 2d 780, 789 (1968).

The challenged two-judge decree[2] of September 9, 1969, holding Monaco and Joachim jointly liable for the total $207,125 merely reiterates and particularizes the decree nisi.

It is axiomatic that directors and officers of a corporation are jointly as well as severally liable for mismanagement, willful neglect or misconduct of corporate affairs if they jointly participate in the breach of fiduciary duty or approve of, acquiesce in, or conceal a breach by a fellow officer or director. See *Higgins v. Shenango Pottery Co.,* supra; *Komenarsky v. Brode,* 307 Pa. 156, 160 Atl. 713 (1932); Fletcher, Cyclopedia Corporations, supra, §1002; 19 Am. Jur. 2d Corporations §1285.

As Mr. Justice (later Chief Justice) KEPHART stated for a unanimous Court in *Komenarsky,* supra: ". . . if they as officers of a company collusively joined to perpetrate some wrong against the company, and thereafter enjoyed the fruits of that wrong, they would be jointly liable for their conduct and jointly and severally liable to account for their illegal acts. . . ." Id. at 160, 160 Atl. at 714.

---

[2] The Honorable Edward J. GRIFFITHS, the chancellor who heard the testimony, should have been sitting at the time, but he unfortunately met an untimely death in a tragic automobile crash while on summer vacation.

Today's world of corporate enterprise, with all its variations and complexities of control, management and finance, and the public's extensive participation in corporate ventures, renders it more imperative than ever before that corporate directors and officers adhere to the highest standards of responsible fiduciary conduct. If our competitive market economy is to operate in the best interests of shareholders and society in general, we can condone no intentional violations of corporate fiduciary duties. Only in this way can the necessary confidence in corporate institutions so essential to the vitality of our economic and social way of life be maintained.

At a time when we all seek the highest level of integrity from those placed in positions of trust, it would be worthwhile to recall the well known admonition of Chief Judge CARDOZO, speaking for the New York Court of Appeals.

"Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. . A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. . . . Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928).

In conclusion, having carefully reviewed the more than 3,700 pages of testimony and exhibits, we find no error in the chancellor's adjudication that Monaco and Joachim conspired to and did divert to their personal advantage the corporate opportunities previously recited. The record clearly reveals that Monaco's actions were intertwined with Joachim's from the outset in a common design to utilize their corporate positions to obtain unjust personal gain. Monaco failed to disclose at the February 12, 1964, Seaboard meeting that the Seaboard-Blue Ridge lease had terminated, that Blue Ridge had sold its interest in the coal banks to Joachim, and that Joachim had entered into an agreement with Pagnotti. Furthermore, Monaco displayed a worthless agreement to the other shareholders and represented that it was a binding agreement between Seaboard and Pagnotti. His affirmative assistance and active participation in depriving Seaboard of corporate opportunities permeate this entire saga.

Accordingly, the decree of September 9, 1969, of the Court of Common Pleas of Philadelphia is affirmed. Appellant to pay costs.

Mr. Justice COHEN took no part in the decision of this case.