In re MAIN, INC., Debtor.

Mitchell Miller, Esq., Trustee, Plaintiff,

v.

Eric J. Blatstein, Lori J. Blatstein, Morris Lift Airbev, Inc., Cobalt, Inc., Delawareco, Inc., Engine 46 Steak House, Inc., Pier 53 North, Inc., Reedco, Inc., Waterfront Management Corp., and Waterfront Valet, Inc., Defendants.

Bankruptcy No. 96–19098DAS.
Adversary No. 98–0073.

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Sept. 22, 1999.

Paul B. Maschmeyer, Ciardi, Maschmeyer & Karalis, PC, Philadelphia, for Main, Inc.

Mitchell W. Miller, Philadelphia, PA, Trustee for Main, Inc.

Eric L. Frank, Philadelphia, PA, General Counsel for Trustee Miller.

Steven M. Coren, Philadelphia, PA, Special Counsel for Trustee Miller.

Edward J. DiDonato, DiDonato & Winterhalter, P.C., Philadelphia, PA, for Eric J. Blatstein.

Michael H. Kaliner, Fairless Hills, PA, for Trustee in Blatstein case.

B. Christopher Lee, Philadelphia, PA, for Jacoby Donner and Corporate Defendants.

Kevin J. Carey, Mesirov Gelman Jaffe Cramer & Jamieson, Philadelphia, PA, for Lori J. Blatstein.

Morris Lift, Wyncote, PA, Pro Se.

W.J. Winterstein, Jr., Philadelphia, PA, Former Attorney for Morris Lift.

Frederic Baker, Philadelphia, PA, Ass't. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

This Opinion is a "companion piece" to our Opinion of September 17, 1999 ("the 9/17 Opinion"), in the bankruptcy case of MAIN, INC. ("Main"). It addresses the second of two separate recent decisions of the District Court ("the Court") arising out of the bankruptcy cases of Main and its principal, Eric J. Blatstein ("Eric") referenced in the 9/17 Opinion. The Court's decision relevant to the instant Opinion is reported at 1999 WL 424296 (E.D.Pa. June 23, 1999), and will be referenced here, as it was in the 9/17 Opinion, as *"Main VII "*.

*Main VII* reversed and remanded a portion of our decisions reported at 223 B.R. 457, 476–80 (*"Main V"*), *supplemented & consideration denied,* 1998 WL 601249 (Bankr.E.D.Pa., Sept. 4, 1998) (*"Main VI"*) in the above-captioned proceeding.

In light of the mandates in *Main VII,* we conclude that Eric and his non-debtor spouse, Lori J. Blatstein ("Lori" with Eric "the Blatsteins"), who cannot be said to have fulfilled her duties as a corporate officer by delegating these duties to Eric, have failed to meet their burdens of proving that they had sound business reasons for allowing Main to make the loans to other entities owned by them on account of which we entered judgments in favor of Main and against these entities in the *Main V* and *Main VI* Orders, in the total amount of $739,060.78, $685,520.78 of which remains unpaid.

However, we note that, in *Main V* and *Main VI,* we held that the Plaintiff, Mitchell Miller, Esquire, the Trustee of Main ("the Trustee"), waived any claim that the Blatsteins were liable for certain penalties for filing late tax returns for Main because he failed to raise this issue in his post-trial brief and because submission of the tax returns was the Trustee's responsibility. The Court did not discuss these findings, and the record contains little, if any, basis on which to measure these claims. Finally, regarding the claims that the Blatsteins are liable for excessive salaries allegedly paid to principally Eric, we find ourselves unable to ascertain the applicable time-period for which excessive salaries as recoverable, precisely what salaries are claimed other compensation the Blatsteins received during the applicable periods, or what salaries would have been reasonable for them to have received. Therefore, we must schedule a supplemental hearing on the tax liability and salary issues in order to decide them, and we do so on October 6, 1999.

## B. PROCEDURAL AND FACTUAL HISTORY

We refer the reader to pages 2–6 of the 9/17 Opinion for a history and perspective of the most important decisions arising out of the bankruptcies of Main and Eric. We will herein focus on the procedural history relevant to the matter before us.

On August 6, 1998, we rendered *Main V,* in which we entered a judgment in favor of the Trustee and against the following Defendants: MORRIS LIFT, the former and financial benefactor of the Blatstein entities, where liability is separate from the Blatstein entities and is not presently in issue, in the amount of $53,000; CO-BALT, INC. ("Cobalt"), in the amount of $85,563.68; DELAWARECO, INC. ("DECO"), in the amount of $76,950; ENGINE 46 STEAK HOUSE, INC. ("Engine 46"), in the amount of $136,628.45; PIER 53 NORTH, INC. ("Pier 53"), which has paid the judgment against it and the amount of whose liability is therefore no longer at issue, in the amount of $53,540; REEDCO, INC. ("Reedco"), in the amount of $46,398.55; WATERFRONT MANAGEMENT CORP. ("Management"), per *Main VI,* in the amount of $337,504.35; and WATERFRONT VALET, INC. ("Valet"), in the amount of $2,475.25. (Cobalt, DECO, Engine 46, Reedco, Management, and Valet are collectively referred herein as "the Corporate Defendants."). However, we entered no judgment against the Blatsteins or Airbev.

We devoted much of our attention in *Main V* and *Main VI* to the following issues, which were those principally raised by the Trustee: (1) a claim that Airbev owed Main for the use of the "Philly Rock" trade name, *id.* at 465–66; (2) a contention that Cobalt was jointly liable with DECO for its obligation as DECO's successor-in-interest, *id.* at 466–67; (3) a claim that Management was accountable for excessive commissions charged to Main, *id.* at 471–76; and (4) a claim that the Blatsteins were both equally liable with the Corporate Defendants for all of the loan liabilities owed by them to Main, receipt of excessive salaries by them, and for certain

tax penalties charged to Main. *Id.* at 476–80.

In *Main VII* the Court addressed issues (1), (2), and (4) referenced above at length, affirming our ruling in favor of the Trustee as to (1), 1999 WL 424296, at *3–*5; reversing our ruling adverse to the Trustee as to (2), *id.* at *5–*11, and requiring our entry of an additional judgment against Cobalt for the sum owed by DECO in the accompanying order; and remanding our ruling adverse to the Trustee as to (4). *Id.* at *11–*21. We therefore need not discuss issues (1), (2), or (3) further. We note that, despite that Cobalt is now described, as is DECO, Engine 46, Reedco, Management, and Valet, as an "assetless shell," Cobalt has appealed the Court's decision to the Third Circuit Court of Appeals.

Focusing only on issue (4) hereafter, *i.e.,* the Trustees' claims against the Blatsteins, we observe that we recited, in *Main V*, two reasons why we were not receptive to these claims. First, we believed that they were in substance a rehashing of the alter ego claims, *id.* at 477, which we rejected in *In re Main, Inc.,* 213 B.R. 67 (*"Main II "*), *modified in part,* 1997 WL 626544 (Bankr. E.D.Pa. Oct. 7, 1997) (*"Main III "*), *aff'd in part & rev'd & remanded in part sub nom. In re Blatstein,* 226 B.R. 140 (E.D.Pa.1998) (*"Blatstein II "*), *reinstated as to issues remanded,* 1998 WL 778017 (Bankr.E.D.Pa. Nov. 4, 1998) (*"Main IV"*), *aff'd as to issues remanded sub nom. In re Blatstein,* 1999 WL 689715 (E.D.Pa. Sept. 3, 1999) (*"Blatstein III "*), *Blatstein II aff'd in part and rev'd in part as to issues not remanded,* 192 F.3d 88 (3d Cir.1999) (*"Blatstein IV"*). The dismissal of these alter ego claims was ultimately affirmed in *Blatstein IV.* Second, we found that there was a lack of focused pleading and specific evidence presented by the Trustee on these issues, particularly when compared to the voluminous evidence presented by the Trustee on the issues of the use of the Philly Rock trade name by Airbev and the excessive amount of Management's fees. *Id.* Accordingly, we concluded that, in comparison with the aforesaid issues on which he certainly undertook to meet a burden of proving, the Trustee had failed to focus upon and establish (1) that the amount of compensation paid to the Blatsteins was excessive, or (2) that the Blatsteins were responsible for the fact that certain of the Corporate Defendants owed monies to Main. *Id.* at 480. Since it seemed to us that the second category of claims were based on the contention that the Corporate Defendants were positioned by the Blatsteins to take financial advantage of Main, we deemed it relevant to observe that the Trustee failed to present any evidence that Main had been in fact a chosen victim of plunder. *Id.* at 478–79. As a result, we rejected the Trustee's attempts to assert these "large, unfocused and unproven miscellaneous claims against the Blatsteins." *Id.* at 479.

As to the claim that the Blatsteins were liable for the penalties imposed by the taxing authorities upon Main for failure to timely file its tax returns and make the corresponding payments to the applicable taxing authorities, we noted that the Trustee was responsible for the preparation of the Debtor's tax returns and payment of the taxes in question. *Id.* at 479. In *Main VI,* without meaning to withdraw the prior reasoning, we held that this claim was not addressed in the Trustee's post-trial brief, which we held in *Main V* recited all of the claims which we would consider, 223 B.R. at 461, was "poorly-presented" and "obscure," and hence was effectively waived.

As to the Blatsteins' liability, the Court, in *Main VII,* at *12–15, found that we had accurately set down the law in *Main V* while describing the fiduciary duties which officers and directors of closely-held corporations owe to these corporations and their creditors in deciding the issue of Management's liability to Main for its inspection of excessive fees, 223 B.R. at 471–73, we had not correctly applied this law in analyzing the Blatsteins' individual liabilities to Main. Specifically, the Court found that

we had erroneously placed the burden on the Trustee to prove a breach of their duties by the Blatsteins rather than requiring the Blatsteins to prove that their receipt of salaries and their transactions resulting in loan obligations of the Corporate Defendants to Main were accomplished in good faith and for legitimate corporate purposes. *Id.* at *16–*18. It therefore remanded the matter to us to enter a new decision which correctly allocated the burden of proof. *Id.* at *16–*18.

The Court also emphasized that, although we had not done so because we found no breach of duty by either of the Blatstein in any event, it would be important, if Eric were found to have breached his duties, that we should now analyze whether Lori's more passive role also justified a finding that she, too, was liable for a breach of her duties as a co-director of Main and the Corporate Defendants. *Id.* at *18–*20. The Court further noted that the solvency of Main was relevant to the analysis of, particularly, the propriety of the loans, and stated that we should also determine this issue on remand as well. *Id.* at *18.

On June 29, 1999, in response to *Main VII*, we entered an order scheduling a status hearing to determine how we would proceed on remand. At a colloquy on July 1, 1999, only Lori's counsel expressed any reservation as to our considering the remanded issues on only the previous record, as opposed to making a supplemental record. We note that in her brief she contended that further testimony should be taken on only the issue of insolvency, which we deem unnecessary for reasons stated at pages 287–288 *infra*. We therefore entered an order directing the parties to file simultaneous opening briefs in support of their respective positions on remand on or before July 30, 1999, and allowed them to file reply briefs on or before August 6, 1999.

In his brief the Trustee argued, much as he did before us originally, that Main was insolvent from November 4, 1993, to date; that the Blatsteins, as directors, officers and controlling shareholders of Main, breached their fiduciary duties to it; that most of the Corporate Defendants are assetless shells; and that the Blatsteins were liable for the funds they personally received from Main, pegged at $1,027,247.24, in addition to the remaining liability of the Corporate Defendants, which we note is $685,520.78.

What we found interesting in this brief was the lack of analysis or even much mention of the burden of proof upon the Blatsteins and how they failed to fulfill same, even though the Court reversed our decisions in *Main VII* almost exclusively on that basis. This is perhaps not surprising when we note that the issue of allocation of the burden of proof was not prominently raised in the Trustee's post-trial submission in *Main V* nor its motion for reconsideration preceding *Main VI*. In fact, the only recitation of the terms "burden of proof" or its cognates which we could locate in the Trustee's massive 75-page *Main V* post-trial submission, containing 383 numbered paragraphs, were passing reference in paragraphs 283 and 284.

We mention this point because it is significant in considering what the parties brought before us and why we find that it is now impossible to decide the salary and tax liabilities issues. We also opine that it is somewhat unfair to the Defendants to decide any of the issues under principles which the parties did not clearly enunciate at trial. This is particularly so when the nature of this proceeding as a confusing mish-mash and "a kind of band-aid placed upon a variety of issues either created by, or left unresolved by" the *Main II* proceedings, 223 B.R. at 461, is observed. In this context, we continue to believe that it was, and perhaps is, fair to only consider the Trustee's arguments as presented in their submissions. *Id.*

The Blatsteins' presentations, one short brief by both and one shorter brief by Lori

alone, offer an interesting contrast to the Trustee's brief. They reveal a painful awareness of the significance of the Court's pronouncements on the burden of proof and wishful assertions that the record might be nevertheless found by us to support a decision in their favor. Rather unfortunately, however, further testimony is said to be necessary only on the issue of Main's insolvency. Our pronouncements of appreciation of Eric's entrepreneurial ingenuity and Lori's stature as a "good wife" are trotted out, as we expect that they were before the Court, as justification for the salaries paid and corporate gymnastics on the part of Eric and innocence of any wrongdoing on the part of "faithful Lori." These statements appear to us clearly insufficient finding of fact to meet the burdens placed on both of the Blatsteins by the Court.

Despite the seemingly rich opportunity for each party to comment on the deficiencies in the opening briefs of the other, the Trustee filed no reply brief and the Blatsteins' reply was a one-page, lightweight contention that the Trustee's brief presented nothing worthy of response or which they conceded. We note that seemingly more attention was devoted to briefs addressing the matter involving $77,000 at issue in the 9/17 Opinion than the instant issues nominally involving, per the Trustee, as much as $2 million.

This attention may reflect the problems of collectibility of any judgments issued here, in light of the apparent limited solvency of the Blatsteins and their entities. On this note, we indicate that, in an effort to introduce a measure of practicability to these matters, as well as ascertain the parties' perceptions of the impacts of the decisions of September 3, 1999, in *Blatstein III* and *Blatstein IV* on the matters before us, we scheduled a status hearing on September 15, 1999, preceded by each parties' report on the financial health of the Blatsteins and their corporate entities. The parties agree that the Blatsteins entireties entity has at least $200,000 equity

in a home, as well as ownership of other assets, and that Pier 53, Airbev, and ownership of a new bar and grill at the Philadelphia International Airport provide them with quite comfortable income. No further plans to seek review of the *Blatstein III* or *Blatstein IV* decisions were reported, and the Trustee's special counsel indicated an intention to focus his immediate attention to the assets of the Blatsteins' entireties entity. We intend to direct our efforts towards a determination of what further actions are deemed necessary to bring administration of the cases of Main and Eric to a close, and setting a timetable for these actions.

## C. DISCUSSION

### 1. *We Reiterate That Main Has Been Insolvent Since November 4, 1993.*

In *Main V*, 223 B.R. at 470–71, in the context of determining that Lift was liable to the Trustee for a $53,000 preference claim, an issue on which the only appeal was abandoned, we made the following pronouncements regarding Main's solvency:

> Insolvency is defined in the Bankruptcy Code as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." See 11 U.S.C. § 101(32). In this case, it appears that the entry of the state court default judgment against [Main], as Blatstein's garnishee, on November 4, 1993, caused [Main] to instantly and permanently become insolvent because the dollar amount of that judgment was $2,774,-803.09, while on that date [Main's] assets were only valued at $507,000 according to its 1993 tax return. Thus, in *Main III*, 213 B.R. at 83, finding that [Main] poor financial status was a "badge of fraud" in its actual fraudulent transfer of Philly Rock to CCO, we held that "Arch's judgment against [Main] rendered [Main] an insolvent, worthless shell."

288

The only response to this assertion which we could locate in the Defendants' recent submissions is a feeble suggestion that the fair market value of [Main's] asset Philly Rock may at some indeterminate point in time have approached or exceeded [Main's] liabilities. This assertion became increasingly doubtful if legitimate debts to Lift are assumed by Main, as the Defendants elsewhere contend. We thus find that the element of insolvency is proven, at least for the critical period one year prior to Main's bankruptcy filing.

This passage appears to establish Main's insolvency at all times after November 4, 1993. Lori's only present argument to the contrary, bereft of any facts which might support a different result, seems to be that, had the Court simply accepted this conclusion, it would have had no reason to remand this issue to us at all, and that its remand on this issue therefore suggests the presence of doubt as to its correctness.

■ The fact that the Court made no reference to the foregoing this passage does not suggest to us the presence of any doubt about this conclusion on its part. Had there been such a doubt, we believe that the Court would have explicitly expressed it. In *Cowgill v. Raymark Industries, Inc.*, 832 F.2d 798, 802 (3d Cir.1987), it is established that, when an appellate court

reverses a judgment and remands for further consideration of a particular issue, leaving other determinations of the trial court intact, the unreversed determinations of the trial court normally continue to work an estoppel. 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice ¶ 30.416[2], p. 517 (3d ed.1984). When the estoppel is operative in proceedings in the same case on remand, courts frequently speak in terms of the law of the mandate or the law of the case rather than collateral estoppel but the underlying principle is the same. *Todd & Co., Inc. v. S.E.C.*, 637 F.2d 154 (3d Cir.1980) (when an

appellate court affirms in part and reverses in part, all issues necessarily disposed of in the affirmance become law of the case even though the case is remanded for proceedings on other issues). "The judicial system's interest in finality and in efficient administration" dictates that, absent extraordinary circumstances, litigants should not be permitted to relitigate issues that they have already had a fair opportunity to contest. *Id.* at 156 (footnote omitted).

Application of this aspect of the "law of the case doctrine" and the absence of any allegation of fact suggesting that a contrary conclusion as to Main's insolvency might exist, cause us to rely on our tentative *Main V* conclusion that, at all times since November 4, 1993, Main has been insolvent.

2. *The Blatsteins Have Presented No Evidence to Sustain Their Burden That They Have Not Breached Their Fiduciary Duties to Main by Allowing Main to Make Unrepaid Inter–Company Loans to the Corporate Defendants While It Was Insolvent.*

■ In light of the Court's discussion in *Main VII*, at *16–*17, we begin from the premise that, at the times that the obligations resulting in the *Main V* and *Main VI* judgments were made, the Blatsteins were under a fiduciary obligation to use Main's assets only in transactions that carried the "earmarks of an arm's length bargain." *Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 84 L.Ed. 281 (1939); and *Bellis v. Thal*, 373 F.Supp. 120, 123 (E.D.Pa.1974), *aff'd*, 510 F.2d 969 (3d Cir. 1975). *See also Goldie v. Cox*, 130 F.2d 695, 699 (8th Cir.1942); *In re Auto Specialties Manufacturing Co.*, 153 B.R. 503, 508 (W.D.Mich.1993); and S. McDonnell, *Geyer v. Ingersoll Publications Co.: Insolvency Shifts Directors' Burden from Shareholders to Creditors*, 19 DEL. J. CORP. 177, 186 (1994).

By its very nature, the concept of "arm's length" bargaining looks not to the outcome of the bargain but to the process of bargaining itself. L. Mitchell, *Fairness and Trust in Corporate Law*, 43 DUKE L.J. 425, 452 (1993). Thus, the essence of the test for arm's length bargaining is whether or not, under all of the circumstances, a transaction has been undertaken in good faith and has been inherently fair to the corporation. *See Pepper, supra*, 308 U.S. at 306, 60 S.Ct. 238; *Koch Refining Co. v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1351 (7th Cir.1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237, (1988); *In re Fineberg*, 202 B.R. 206, 225 (Bankr.E.D.Pa.1996); *In re Comtec Industries, Inc.*, 91 B.R. 344, 347 (Bankr.E.D.Pa.1988); *In re Eagson Corp.*, 58 B.R. 395, 396 (Bankr.E.D.Pa. 1986); *In re Rittenhouse Carpet, Inc.*, 56 B.R. 131, 133 (Bankr.E.D.Pa.1985); and *In re Alpha–Omega Communications, Inc.*, 52 B.R. 846, 849 (Bankr.E.D.Pa.1985). If it were not in good faith or inherently fair, equity would require setting it aside. *Pepper, supra*, 308 U.S. at 306–07, 60 S.Ct. 238; and *Koch, supra*, 831 F.2d at 1351.

In the instant circumstances, the undisputed facts on the record show that the loans in question were provided (1) without interest; (2) without repayment terms; (3) to credit-unworthy entities with no collateral or security; (4) without fair consideration; and (5) without written loan documentation. Therefore, the process by which the loans were negotiated reveals that these transactions fail to embody the earmarks of "arm's length" bargains. In other words, the loans in question were neither bargained in good faith nor were inherently fair to the protection of Main's assets.

Following the Court's directives, we pass on to determine whether the Blatsteins have proved on the record that the loans provided were in Main's best interest. At the same time, we must determine, as to these transactions, (1) whether Lori had a fiduciary duty, as a director, to object to the loans made to the Corporate Defendants, and (2) whether she breached her fiduciary duty to Main and its creditors by acquiescing in Eric's decisions to lend Main's funds to several of the other corporate entities which they controlled.

The Trustee contended that the Blatsteins breached their fiduciary duties by loaning Main's funds to the Corporate Defendants. To support this contention, the Trustee relied, *inter alia*, on the fact that the monies lent to the other Corporate Defendants were loaned (1) at a time when Main was insolvent and could not meet its own obligations; (2) without interest, thus depriving Main's creditors of any return, much less a fair return, on the money loaned; (3) to entities wholly owned and controlled by the Blatsteins; (4) to companies that did not, could not, and would not repay the monies lent; and (5) to start new businesses for the Blatsteins, thereby usurping Main's own potential business opportunities. The Trustee accordingly maintained that the inter-company loans at issue, in addition to not being "arm's length" transactions, were not in the best interests of Main, citing *Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 217 n. 23 (3d Cir. 1990); *Flannery Bolt Co. v. Flannery*, 16 F.Supp. 803, 805 (W.D.Pa.1935), *modified*, 86 F.2d 43 (3d Cir.1936) ("[It is] unlawful, per se [for a corporate officer or director to participate in a transaction] both on the side of the corporation as for himself"); *In re Harry Levin, Inc.*, 175 B.R. 560, 568 (Bankr.E.D.Pa.1994) ("if the defendant … misuse[d] the debtor's assets for his own benefit and to pay his own expenses, such conduct should be considered fraudulent"); *In re Specialty Tape Corp.*, 132 B.R. 297, 301 (Bankr.W.D.Pa.1991); *In re Logue Mechanical Contracting Corp.*, 106 B.R. 436, 439 (Bankr.W.D.Pa.1989) (" 'Directors and officers may be held liable for losses suffered by the corporation as a result of their failure to use reasonable and ordinary skill, care and diligence in the conduct of corporate business.' "), quoting *In*

*re Simplified Information Systems, Inc.,* 89 B.R. 538, 545 (W.D.Pa.1988); and *Bailey v. Jacobs,* 325 Pa. 187, 194, 189 A. 320, 324–25 (1937).

The Trustee contended that the nature of the loans provided negates any possible pretext set forth by the Blatsteins that the loans in question were fair and in the best interest of Main's creditors. According to the Trustee, the fact that these loans failed to be in Main's best interest may be demonstrated simply by pointing out that, while the Trustee has outstanding judgments against the Corporate Defendants totaling nearly $750,000, the Trustee has been unable to recover more than about $50,000 of this amount despite the expenditure of vigorous efforts by his special counsel to collect these amounts for over a year since their original entry.

The Trustee further asserted that Lori, like Blatstein, breached her fiduciary duties as a director of Main. To support this assertion, the Trustee relied heavily on the facts that, at the trial of the *Main V* proceeding, (1) Lori admitted on the record that she knew her husband used Philly Rock's monies to make loans to the other Corporate Defendants; and (2) the record showed that, at the same time that these Corporate Defendants were not repaying Main, they were making very large deposits, totaling in excess of $2 million, into Lori's own Gruntal investment account. According to the Trustee, "[d]irectors and officers of a corporation are jointly and severally liable for mismanagement, willful neglect, or misconduct of corporate affairs if they jointly participate in the breach of fiduciary duty or approve of, acquiesce in, or conceal a breach by a fellow officer or director," quoting *Seaboard Industries Inc. v. Monaco,* 442 Pa. 256, 276 A.2d 305, 309 (1971). As a result, the Trustee contended that Lori, like Eric, is liable for the breaches of fiduciary duties to Main.

The Blatsteins countered by observing that the loans involving Main, Pier 53, Columbusco, Inc. ("CCO"), DECO, Engine 46, and Reedco accounted for less than four (4%) percent of the total transactions engaged in by these corporations. Next, they observed that, although the Gruntal account reflects deposits in excess of $1,300,000, almost $1,500,000 was paid out of the same account to or on behalf of the corporate entities. In the Blatsteins' opinion, this is reflective of the mutual support given to the various corporations, not only in the form of contributions or loans from them personally, but to and from the various corporations themselves. Further, the Blatsteins maintained that the loans at issue were neither out of the ordinary nor a breach of fiduciary duty by either of them, citing our conclusions in *Main V,* 223 B.R. at 479. Then, the Blatsteins conclude that the loans in question were a part of a mutually-beneficial synergetic relationship between all of their corporate entities and themselves, relationships which can and should serve as a basis for a conclusion under the guidelines fixed by the Court that the loans at hand were indeed either at arm's length or better terms, and/or in the best interest of all of the corporate entities, including Main, and their respective creditors.

Applying the Court's directives, we conclude that the arguments presented by the Blatsteins cannot succeed. A scrutiny of the facts on the record reveals that the Blatsteins, as fiduciaries, not only failed to prove the good faith of the transactions incurred, but also the inherent fairness of those dealings to Main and its creditors. *See, Pepper, supra,* 308 U.S. at 306, 60 S.Ct. 238; *Geddes v. Anaconda Copper Mining Co.,* 254 U.S. 590, 599, 41 S.Ct. 209, 65 L.Ed. 425 (1921); *Borden v. Sinskey,* 530 F.2d 478, 495 (3d Cir.1976); *In re McLaren,* 236 B.R. 882, 902 (Bankr.D.N.D. 1999); *In re Colonial Realty Co.,* 210 B.R. 921, 923 (Bankr.D.Conn.1997); *Fineberg, supra,* 202 B.R. at 225; *Comtec, supra,* 91 B.R. at 347; *In re Famous State Fair Meat Products, Inc.,* 19 B.R. 48 50–51 (Bankr.E.D.Pa.1982); and R. Hughes, *Fiduciary Duties of Corporate Directors of Insolvent Corporations,* 715 PLI/Comm

839, 847 (1995). At no time have the Blatsteins provided any evidence as to when the loans were to be repaid, or if they were to be repaid at all. No loan agreements, no proof of loan payments, nor any promissory notes with regard to the monies loaned were produced on remand. Since there is no evidence of the propriety of these transactions, we cannot find that the Blatsteins have met their burden of proving that the loans provided were in the best interest of Main. Their failure to produce any evidence also reflects upon their inability to prove their adherence to their duties at hand as fiduciaries of Main. Accordingly, we must conclude that Blatsteins breached their fiduciary duties to Main in creating the obligations of the Corporate Defendants to Main and sustain the arguments of the Trustee on that point.

■ As to Lori's liability, *Main VII*, at \*19–\*20, provides the legal precepts for us to follow on remand. Applying these precepts to our instant analysis forces us to conclude that Lori did indeed have a fiduciary duty to object to the loans provided, and that she breached those duties at hand by acquiescing, without an apparent question or complete understanding of precisely what he was doing, to Eric's decision to lend Main's funds to the Corporate Defendants.

■ The reasoning behind this conclusion begins from the premise that every director is a fiduciary. *Pepper, supra,* 308 U.S. at 306, 60 S.Ct. 238, quoting *Twin–Lick Oil Co. v. Marbury,* 91 U.S. 587, 588, 23 L.Ed. 328 (1875). *See also In re Allegheny Int'l, Inc.,* 954 F.2d 167, 180 (3d Cir.1992); *In re Truco, Inc.,* 110 B.R. 150, 152 (Bankr.M.D.Pa.1989); *Seaboard Industries, supra,* 442 Pa. at 261–62, 276 A.2d at 309 (1971); *Porter v. Healy,* 244 Pa. 427, 435–36, 91 A. 428, 431 (1914); and *Bird Coal & Iron Co. v. Humes,* 157 Pa. 278, 287, 27 A. 750, 752 (1893).

■ This fiduciary obligation includes both a duty of care and a duty of loyalty.

15 Pa.C.S. §§ 512(a), 1712(a); *Norlin Corp. v. Rooney,* 744 F.2d 255, 264 (2nd Cir.1984); *Enterra Corp. v. SGS Associates,* 600 F.Supp. 678, 684–85 (E.D.Pa. 1985); and W. & T. Levine, *Current Status of the Duty of Due Care and the Business Judgment Rule,* C859 ALI–ABA 797, 799 (1993). The duty of care obligates every corporate director to discharge duties to the corporation with the same diligence, care, and skill which ordinary prudent persons exercise in their personal affairs; failure to exercise such care renders any corporate director liable for resulting corporate losses. *See In re Athos Steel & Aluminum, Inc.,* 71 B.R. 525, 540 (Bankr.E.D.Pa.1987). *See also Brown v. Presbyterian Ministers Fund,* 484 F.2d 998, 1004 (3rd Cir.1973); *In re New York City Shoes, Inc.,* 84 B.R. 947, 958 (Bankr. E.D.Pa.1988); *Wolf v. Fried,* 473 Pa. 26, 29, 373 A.2d 734, 735 (1977); and *S.N.T. Industries, Inc. v. Geanopulos,* 363 Pa.Super. 97, 102, 525 A.2d 736, 739 (1983).

■ The duty of loyalty, on the other hand, requires that corporate directors devote themselves to corporate affairs with a view to promote the common interests and not only their own, and they cannot directly or indirectly utilize their position to obtain any personal profit or advantage other than that enjoyed by their fellow shareholders. *Athos Steel, supra,* 71 B.R. at 540. *See also In re Insulfoams, Inc.,* 184 B.R. 694, 703 (Bankr.W.D.Pa.1995); *New York City Shoes, supra,* 84 B.R. at 958; *Lutherland v. Dahlen,* 357 Pa. 143, 151, 53 A.2d 143, 147 (1947); and *Hill v. Hill,* 279 Pa.Super. 154, 160, 420 A.2d 1078, 1081 (1980), quoting *Bird Coal, supra,* 157 Pa. at 287, 27 A. at 752. Whether these duties have been performed is a question of fact to be determined by an examination of all the circumstances in the case. *See Selheimer v. Manganese Corp. of America,* 423 Pa. 563, 581, 224 A.2d 634, 644 (1966).

■ In the instant case, the circumstances surrounding the loans at issue reveal that Lori knew that her husband used

Philly Rock monies to make interest-free loans without repayment schedules to the other Corporate Defendants of which she was a director and shareholder. Therefore, not only did Lori breach her fiduciary obligations by disregarding her duties of loyalty and care, but also she openly neglected those duties by taking no positive steps to correct illegal corporate actions. Failure to take positive steps to correct an illegal corporate action is the equivalent of active participation in the illegal scheme. *See Metzger v. American Food Management, Inc.,* 389 F.Supp. 469, 471 (W.D.Pa. 1975).

 In Pennsylvania, as in other jurisdictions, when one fiduciary either approves, acquiesces in, or conceals a breach of duty by another fiduciary, both are jointly and severally liable. *See Higgins v. Shenango Pottery Co.,* 256 F.2d 504, 509–11 (3d Cir.1958); *Keyser v. Commonwealth Nat'l Financial Corp.,* 675 F.Supp. 238, 263 (M.D.Pa.1987); *Seaboard Industries, supra,* 442 Pa. at 261–62, 276 A.2d at 309; and *Komenarsky v. Brode,* 307 Pa. 156, 160, 160 A. 713, 714 (1932). *See also,* 3 W. FLETCHER, CYCLOPEDIA ON THE LAW OF PRIVATE CORPORATIONS, § 1002, at 719–20 (1991 & 1998 Supp.); and 18B AM.JUR.2d, Corporations § 1720, at 573–74 (1987 & Supp. 1997). Accordingly, by failing to take positive steps to correct the illegal transactions of Eric in issue, Lori acquiesced to Eric's actions and equally breached her fiduciary duties to Main.

As best we can ascertain, all of the loans in question which comprised the uncollected *Main V* judgments totaling $685,520.78 were made subsequent to November 4, 1993. Therefore, Main appears to have been insolvent when all of these transactions were made. Under the law as recited by the Court, these facts render the Blatsteins liable to the Trustee, jointly and severally, in the total amount of $685,520.78.

It is not clear to us that potential solvency of Main at the time that the loans were made should necessarily lead to a different result. However, if the Blatsteins believe that any of the transactions for which they are herein held liable pre-dated November 4, 1993, and that Main's insolvency as of the date of any transaction reciting liability is indeed significant, we are certain that they will bring that matter to our attention in a timely motion for reconsideration.

3. *The Record Is Insufficient to Determine Whether the Blatsteins Received Excessive Salaries from Main Which They Are Liable to Repay to the Trustee.*

 The Court also remanded to us the issue of whether the Blatsteins received excessive salaries from Main in breach of their fiduciary duties to Main and are personally liable to the Trustee therefor. In his present brief, the Trustee argued that the Blatsteins, as directors, officers, and controlling shareholders of Main, are personally liable to the Trustee in the amount of $1,027,247.24, which they claim represents the sum which they took out of Philly Rock "while Main was insolvent," through February 1998, for breaching their duties as officers, directors, and sole shareholders of Main. The Blatsteins, on the other hand, contend that neither of them breached any fiduciary duties by receiving funds from Main and the Philly Rock assets. To support their contention, the Blatsteins quote from our prior observations in *Main V,* 223 B.R. at 478–79, describing the fairness of the consideration provided.

Unlike the issue of the Corporate Defendants' loan repayment obligations, which are liquidated in our final judgment order against these parties in *Main V* and *Main VI,* the amount at issue in the Trustee's salary claims is unclear to us. In his post-trial submission in *Main V,* the Trustee set the figure at $1,058,328.05, referencing the same source as he now cites to support the $1,027,247.24 figure.

While this approximately $30,000 discrepancy appears rather insignificant in view of the large figures cited by the Trustee, we are bound to consider the intervening analysis of the Court. The Court in *Main VII* states, at *12, as follows:

> The Trustee seeks to recover a total of $1,058,055.09 from Eric and Lori Blatstein, jointly. This sum can be divided, as the bankruptcy court did, into two major components: amounts which the Blatsteins personally received from the Philly Rock assets ($372,734.131), and amounts which the Blatsteins allowed their other corporations to receive as loans from the Philly Rock assets ($685,320.78) (footnote reiterating these calculations omitted) . . . .

We do not believe that we made any division of the figures stated or that we used the $372,734.31 figure. We do note that this figure is that which the Trustee alleges that the Blatsteins "removed" from Main in the year prior to Main's bankruptcy filing alone. The Court's total figure is, moreover, very close to the figure for which the Trustee attempts to hold the Blatsteins liable *in addition to* the $685,520.78 figure which the Trustee seeks on account of the failure of the Corporate Defendants to satisfy the loan obligation judgments against them. We should note that we cannot explain the $200 discrepancy between the Court's $685,320.78 and our $685,520.78 figure for the Corporate Defendants' loan liability either, but we believe that our figure is, mathematically, the correct sum of the unpaid liability of the Corporate Defendants. While we are comfortable utilizing our figure very close to that of the Court in fixing the Blatsteins' loan liability, we are much more reluctant to make any use of a figure which is almost three times that which the Court recites as that which it believes is the sum at issue in the excess salary dispute.

In addition to being uncertain regarding the amount of excess salary in dispute, we are also uncertain regarding (1) the period of time over which the sum at issue, whatever it is, has accrued; (2) what sums in the nature of salaries the Blatsteins received from other sources; and (3) what amounts would be reasonable salaries for the services which they performed on Main's behalf.

The Trustee claims that the Blatsteins received "more than $500,000" from Management alone in 1996 and hence were not entitled to any additional amounts paid to them by Main in the nature of salaries. However, we note that, in rendering them liable for the Trustee's $337,504.85 judgment awarded against Management in *Main VI*, we have already allowed the Trustee to obtain a judgment for the excessive management fees paid in part to the Blatsteins, particularly Eric, by Main.

The period over which the salaries were paid must also be ascertained before the Blatsteins' potential liabilities therefor can be fixed, not only for coordination with the period when Main was insolvent, but also for ascertaining the reasonability of the salaries paid to the Blatsteins annually. For example, salaries totaling $372,000 over several years are hardly monumental, whereas that same amount annually might be so viewed.

We also note the law of Pennsylvania pertinent to salaries, which is that "a salary must bear a reasonable relation to the officer's ability and to the quantity and quality of the services he [or she] renders." *Ferber v. American Lamp Corp.*, 503 Pa. 489, 495, 469 A.2d 1046, 1049 (1983). *See also* 18B AM.JUR.2d, *supra*, Corporations § 1925, at 779–81; and 8A P.L.E. 371–75, 377–79 (1973 & 1999 Supp.). We also note that there is no generally accepted rule as to which party has the burden of proof on the question of reasonableness when the reasonability of a corporate insider's salary is challenged. *See Bermann v. Meth*, 436 Pa. 88, 90, 258 A.2d 521, 522 (1969). As noted by the Supreme

Court of Pennsylvania in *Bermann, supra,* 436 Pa. at 90–91, 258 A.2d at 523,

> "in an action by a minority stockholder questioning the compensation voted by the directors to an officer, the burden of proof to establish that the salary paid was unreasonable is on the plaintiff, though in an action against directors or other officers to recover money received or retained by them as salary or compensation, the burden of showing the value of their services is on the defendants." [5A W.] FLETCHER [,*supra* ], § 2181[,] at 695–96 (1965). *See also Binz v. St. Louis Hide and Tallow Co.,* 378 S.W.2d 228 (Mo.App.1964); *Riddle v. Mary A. Riddle Co.,* 142 N.J.Eq. 147, 59 A.2d 599 (1948). On the other hand, there is authority that: "The burden of proving the facts necessary to establish his cause of action rests on plaintiff regardless of whether the action is by an officer or director to recover compensation or whether it is to enjoin or recover back a payment of compensation to him." 19 C.J.S. Corporations § 810(c)[,] at 209 (1940).

However, it appears that, despite the language in *Bermann,* we must adhere to the Court's mandates in *Main VII,* and shift the burden of proving the reasonableness and fairness of the salaries at issue to the Blatsteins.

By doing so, we note that the Blatsteins, like the Trustee, did not offer to us at trial any evidence regarding the amount of salary or other compensation paid to any other persons in comparable positions with restaurant establishments similar in size and revenues to Philly Rock, from which we could determine whether the amounts paid to them were excessive given their duties. As the Blatsteins are quick to point out, we did state in *Main V,* 223 B.R. at 478–79, that

> [t]he Blatsteins, particularly Eric Blatstein, have put a great deal of time and energy into the operation of Philly Rock and their other corporations. If it were not for the ingenuity as well as the hard

work and dedication of Blatstein to Philly Rock, that business would have been unlikely to have been nearly as successful as it has been. It appears that the restaurant has a solid, loyal customer base that continues to patronize Philly Rock even while the neighboring movie theater is under construction, making it difficult for passers-by to ascertain whether Philly Rock is even open for business. We must give credit to Blatstein for creating this customer loyalty.

We further note, as evidenced by the testimony of Accountant George L. Miller, at the trial of the *Main V* proceeding on May 6, 1998, Transcript 48,

> what does ... Blatstein do? Well, he takes Main, that's doing about $1.9 million in business and he builds it up to a company now doing about three and a half million dollars in business... I mean, he's growing a business through the entire, ..., period of time...

Actions alleging payment of excessive compensation to corporate insiders always present great difficulties to courts because it is almost impossible to assign a dollar figure to an individual's worth to a company. There is a tendency to look only to objective factors like age and hours worked because they help create some objective standards in this uncertain area of the law. Nonetheless, we recognize that intangible factors must be evaluated also. As the Court stated in *Bermann, supra,* 436 Pa. at 92, 258 A.2d at 523:

> "To come within the rule of reason the compensation must be in proportion to the executive's ability, services and time devoted to the company, difficulties involved, responsibilities assumed, success achieved, amounts under jurisdiction, corporation earnings, profits and prosperity, increase in volume or quality of business or both, and all other relevant facts and circumstances." [3A W.] FLETCHER, [*supra,* ] at 742 (1965).

*See also,* 12 Summ. PA Jur.2d, Business Relationships § 8:94, at 531–32 (1993).

Thus, if we evaluate (1) Blatstein's accomplishments in augmenting Philly Rock's clientele, (2) the difficulties involved in developing the business at hand, (3) the responsibilities and dedication assumed, (4) the success achieved among its strong customer base, and (5) the earnings, profits, and prosperity realized, we might arrive at the same conclusion we reached in *Main V, i.e.,* that, as long as the annual figure was not huge, the Blatsteins did not receive excessive salaries for their work performed.

█ In any event we are not prepared to engage in guesswork as to potential liability of the Blatsteins for excessive salaries received on the instant record. We will schedule a further hearing on this issue promptly on a seemingly rather clear calendar date, October 6, 1999. In attempting to adhere to the Court's mandate, we will place the burden of proving the reasonability of the Blatsteins' salaries, by reference to expert testimony or other objector criteria, on them. However, we believe that we must place at least the burden of proving what the Blatsteins received in lieu of salary and over what period the sums at issue were received on the Trustee.

4. *The Trustee, by His Failure to Argue Same to This Court at Trial, Was Held by Us to Have Waived Any Claims of Liability to the Trustee for Main's Tax Penalties; In Light of the Remand, We Must Receive Additional Evidence to Determine Whether to Fix Any Liability on This Ground.*

█ We apparently did not make clear our reasons for rejecting the Trustee's claim that the Blatsteins were liable to the Trustee for certain liabilities resulting from a delay in payment of certain of Main's tax liabilities. Since the amount involved is small, in the range of $10,000 to $21,000, we shall briefly explain our rea-

soning and our inability to enter a judgment on this claim at this juncture.

In *Main V,* addressing the issue despite the Trustee's failure to mention this claim in his brief, we pointed out that the payment of Main's taxes, or at least ascertainment of its tax liability, were the Trustee's responsibility, not that of the Blatsteins. 223 B.R. at 479–80. We could add that the Trustee's intense investigation of all aspects of Philly Rock's business by his expert accountant should have made him aware of the status of all of Main's tax liabilities.

In *Main VI,* while not in any sense intending to withdraw our prior statement that the filing of the tax return was the Trustee's responsibility, we stated as follows regarding this claim, at *1–*2:

> Initially, we noted in [*Main V*] our dependence on the [Trustee's] post-trial submissions as our guide to the nature of the [Trustee's] claims because the pleadings, record, and applicable legal theories frequently failed to mesh. [223 B.R. at 461]. Despite a week to locate same, the [Trustee] was unable to refute our observation that this particular issue was not discussed in any sense in the [Trustee's] lengthy post-trial submission and for that reason was not understood to be at issue.

> The [Trustee] was able to identify only a short page and a half excerpt from the hundreds of pages of testimony which allegedly related to this claim. This testimony merely established that CCO paid certain operating expenses, including salaries to Blatsteins, prior to paying the taxes on time. The Complaint does make reference to the Blatsteins' alleged breaches of fiduciary duty in allowing tax penalties to accrue to the Debtors, although no mention is made that this is through the medium of CCO. The tax liability at issue, allegedly supported by a few pages of the voluminous exhibits admitted at trial, is apparently in the $10,000 to $15,000 range.

In sum, we held that this claim, if it was ever made, was not pursued at trial and was in any event abandoned by the failure of the Trustee to mention it in its 75–page post-trial brief. *See e.g., In re Laramie Associates, Ltd.,* 1997 WL 67848, at *12 (Bankr.E.D.Pa. Feb. 12, 1997), and cases cited therein.

We acknowledge that the Court remanded this issue to us to determine whether the Blatsteins are liable for any actions on their part for Main's failure to timely pay certain taxes, allegedly incurring penalties therefor in the amount of $20,873. The Court stated that we must apply the fiduciary duties of the Blatsteins to their corporations' creditors and "consider whether the Blatsteins can prove that their decision not to pay withholding taxes, when funds were apparently available to do so, was in the best interests of Main, [CCO], and its creditors." *Main VII,* at *21.

■ We are well aware of the mandate rule. *See* the 9/17 Opinion, 1999 WL 740252, at *7, 239 B.R. 59, at 67–68. From the foregoing statements of the Court, it would appear that the Court at least implicitly decided that the Trustee did not waive this claim, since it remanded the matter to us on its merits. *See Guidry v. Sheet Metal Workers Int'l Ass'n, Local 9,* 10 F.3d 700, 707–08, *on reh'g,* 39 F.3d 1078 (10th Cir.1993), *cert. denied,* 514 U.S. 1063, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1994). There is an exception to the mandate rule if the appellate decision is "clearly erroneous and unjust," but it is "rarely invoked." *Federated Rural Electric Ins. Co. v. Arkansas Electric Cooperatives, Inc.,* 896 F.Supp. 912, 914, 915 (E.D.Ark.1995). *Cf. Bridge v. United States Parole Comm'n,* 981 F.2d 97, 103 (3d Cir.1992). Justice requires us to point out that the Court appears to be unaware of our holding that this claim, if it in fact were made prior to the Trustee's post-trial motion, was not raised, pursued, or argued at trial. The Court also assumes that we "withdrew" our finding that the Trustee was responsi-ble for preparing Main's tax returns, which was not the case.

Although we must follow the mandate rule, we also must observe that this claim was supported by only the barest reference at trial. We also find it impossible to quantify the Trustee's damages on the record made at the trial. We therefore conclude that the record must be left open for the Trustee to quantify this claim and to allow an opportunity to the Blatsteins to defend against it before imposing liability against them on this claim. In fact, the Court's statement that we should ascertain on remand "whether the Blatsteins can prove" that the nonpayment of taxes did not violate their fiduciary duties appears to suggest that we should take testimony on this issue from the Blatsteins on remand. We therefore will take testimony on this issue also at the hearing scheduled on October 6, 1999.

## D. CONCLUSION

The following order is based on the foregoing conclusions.

### ORDER

AND NOW, this 22nd day of September, 1999, upon consideration of the parties' submissions following a remand pursuant to the Memorandum and Order of June 23, 1999, of the District Court in C.A. No. 98–5947 (E.D.Pa.), reversing and remanding certain aspects of this court's orders dated August 6, 1998, and September 8, 1998, in initially deciding the above-captioned proceeding after trial, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of Mitchell Miller, Esquire, Trustee of the above-named Debtor's estate ("the Trustee") against COBALT, INC., in the additional amount of $76,950.

2. Judgment is entered in favor of the Trustee against ERIC J. BLATSTEIN and LORI J. BLATSTEIN ("the Blatsteins"), jointly and severally, in the amount of the unpaid loan obligations of other corporate defendants to the Debtor, *i.e.,* $685,520.78.

3. A hearing is scheduled to consider further evidence deemed necessary by this court to resolve the claims of overpayments of salaries and other benefits to the Blatsteins by the Debtor and the Blatsteins' liability for penalties imposed against the Debtor for failing to promptly submit tax payments on

WEDNESDAY, OCTOBER 6, 1999, AT 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.