PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1819
_____

HAROLD C. LAMPE, JR.,
Debtor

Jestyn G. Payne, Esq. Custodian for
LL, a Minor,
Appellant
v.

Harold C. Lampe, Jr.
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 2-11-cv-00184)
Honorable Timothy J. Savage, District Judge
_____

Argued October 5, 2011

BEFORE:  McKEE, Chief Judge, and FUENTES and
GREENBERG, Circuit Judges

(Filed: December 30, 2011)
_____

Barry W. Sawtelle (argued)
Kozloff Stoudt
2640 Westview Drive
P.O. Box 6286
Wyomissing, PA 19610-0000

    Attorneys for Appellant

Corrine M. Samler
Paul J. Winterhalter (argued)
1717 Arch Street
Suite 4110
Philadelphia, PA 19103

    Attorneys for Appellee
_____

OPINION OF THE COURT
_____

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I.    INTRODUCTION

Jestyn G. Payne, successor custodian for shares of stock owned by L.L., a minor, appeals from an order of the District Court affirming the Bankruptcy Court's order dismissing an adversary proceeding that Payne brought against the debtor,

2

Harold C. Lampe, Jr. ("Harold"), the prior custodian for the shares, and sustaining Harold's objections to Payne's proof of claim. In the Bankruptcy Court, Payne sought to recover $345,000 from Harold, claiming that Harold breached his fiduciary duties owed to L.L. when he secured and retained that sum in partial satisfaction of a judgment that he obtained against WEL Management, Inc. ("WEL"), a family business of which he was a director and in which he and L.L. were the shareholders of record. In particular, Harold held one WEL share and was the custodian for L.L. of nine WEL shares, the remaining 90% of its outstanding shares. Despite the potentially conflicting interests between his role both as a WEL director and custodian of L.L.'s shares on the one hand, and his status as a creditor of WEL on the other, the District Court and the Bankruptcy Court determined that Harold did not breach his fiduciary duties either as a WEL director or as the custodian for L.L.'s shares when he secured the judgment and partially obtained satisfaction for it from the sale of WEL's assets. For the following reasons, we will reverse.

II.     FACTS AND PROCEDURAL HISTORY

        A.     The Lampe Family Businesses

        In approximately 1983, Harold, a paper salesman for a company not involved in this case, wrote a book about problems associated with the use of paper in commercial printing operations. About two years later, Harold and his son William Lampe ("William") started Paper Complaints, Inc. ("PCI-1"), a

3

Pennsylvania corporation, to market Harold's book and to provide consulting services to the printing industry. Harold and William were PCI-1's sole shareholders. After they formed PCI-1, Harold continued to work as a paper salesman while William ran PCI-1's day-to-day operations. Between 1985 and 1991, Harold made loans to PCI-1 to assist its business, either by writing checks to PCI-1 or paying bills on its behalf. Although there were no written agreements memorializing the terms of the loans, Harold testified in the Bankruptcy Court that he and William agreed that PCI-1 would repay the loans with around nine or ten percent interest.

Around 1985 William married Theresa Lampe ("Theresa") and during the marriage, L.L. was born. In 1991 William told Harold that Theresa wanted to start a new company, Printing Consulting, Inc. ("PCI-2"), that Theresa and William would own equally, to replace PCI-1. Harold agreed to the arrangement on the condition that the loans he had made to PCI-1 were repaid. In 1992, as agreed, PCI-1 ceased operating and William and Theresa formed PCI-2, another Pennsylvania corporation to take its place. Nevertheless, Harold's loans were not repaid. PCI-2 engaged in the same kind of business as PCI-1 but it differed to the extent that it focused more on consulting services than on selling Harold's book. Between 1991 and 2003, Harold made loans to PCI-2, both to help with the formation of the company and with its ongoing operations. As had been the case with Harold's loans to PCI-1, there was no documentation evidencing his loans to PCI-2. Harold testified at the adversary proceeding, however, that he made the loans with the understanding that, like his loans to PCI-1, they would be repaid at nine or ten percent interest. In total, Harold lent

4

almost $300,000 to PCI-1 and PCI-2.

In addition to forming PCI-2, between 1991 and 2003 William and Theresa formed or acquired a number of other closely-held Pennsylvania corporations as well as substantial real estate holdings. As significant here, in 1991 William and Theresa formed WEL to provide a variety of services to the couple's other businesses. William, Theresa, and Harold were WEL's directors. WEL made intercompany financial transfers, provided accounting services to PCI-2, and made investments. Theresa was primarily responsible for running WEL and served as its president, while William devoted his time to PCI-2 and GTP Plastics, another company that he and Theresa owned. As we stated above, WEL issued one share of stock to Harold around the time that it was formed,[1] and, in addition, issued a certificate dated January 14, 1993—soon after L.L.'s birth—that certified that it had issued nine shares of stock to Harold as custodian for L.L. under the Pennsylvania Uniform Gifts to Minors Act, the predecessor to the Pennsylvania Uniform Transfers to Minors Act.

B.    Harold's Lawsuits and Judgment Against WEL

_____

[1] According to William, the stock in WEL was issued to Harold because when William and Theresa formed that corporation neither "could really take ownership in anything based on the workouts that we were dealing with [with a creditor] . . . so . . . we put the shares in with [Harold.]" App. at 239. It seems evident, however, that William and Theresa regarded themselves as the real owners of WEL.

5

Eventually Harold came to believe that WEL was using and managing some of the money he was lending to PCI-2.[2] The evidence in the Bankruptcy Court adversary proceeding showed that PCI-2 made significant payments to WEL marked as "loans," but there was no evidence that WEL ever repaid PCI-2 for any loans. Notably, the Bankruptcy Court found that PCI-2 transferred income to WEL for the purpose of making payments to Royal Bank on a loan that the bank made to a Lampe company, apparently GTP Plastics.[3]

In September of 2002, Harold filed a state court action against WEL, PCI-2, William, Theresa, and several other entities, seeking repayment of his loans. Theresa retained separate counsel to represent her and WEL in this litigation. Harold, however, dismissed the 2002 lawsuit without prejudice. At the adversary proceeding, Harold offered several reasons to the Bankruptcy Court explaining why he dismissed the 2002 lawsuit, including one explanation that Harold's lawyer was "in over her head," and another that William told him that the lawsuit was interfering with divorce proceedings then pending between Theresa and him. App. at 208.

On December 8, 2003, Harold and William held a WEL

---

[2] The loans to PCI-2 were separate from a loan that Harold claims he made to WEL.

[3] We find the circumstances surrounding the bank loan to be unclear, but we believe that GTP Plastics was the obligor on the bank loan. In any event, our result does not depend on the details of the loan.

6

directors' meeting to remove Theresa as its president though they did not remove her as a director at that time. Harold testified that he called the meeting because Theresa had defaulted on all of WEL's bank loans and he and William needed to regain access to company records. The Bankruptcy Court found that "there is no evidence in the record that [Harold] agreed to vote Theresa out as President of WEL so that he could obtain a judgment against WEL for the loans that had [been] made to [PCI-1] or [PCI-2]." [4] App. at 35.

On May 28, 2004, Harold filed a second loan repayment lawsuit against WEL and PCI-2 in the Court of Common Pleas of Berks County, Pennsylvania. Harold alleged in this action that PCI-2 owed him over $800,000, consisting of nearly $300,000 in loan principal and over $500,000 in interest calculated at ten percent per year. Harold asserted that he also had lent WEL $31,000 by borrowing from his personal line of credit and that WEL now owed him over $96,000, a figure that included accrued interest. Though Harold acknowledges that he had made the bulk of the loans to PCI-2, as we have indicated he claimed that William and Theresa diverted PCI-2's funds to WEL and thus PCI-2's and WEL's funds were commingled. He

---

[4] Though we do not make a finding that Harold sought to remove Theresa as president of WEL so that he could obtain a judgment against that corporation, we point out that, contrary to what the Bankruptcy Court seemed to believe, it is reasonable to draw an inference that he sought to remove Theresa for that precise purpose. After all, he knew that she had contested his original action and thus he had reason to believe that she would oppose his second action as well.

therefore contended that PCI-2 and WEL were alter egos so that the court should pierce the corporate veil between them and regard them as a single entity. William, who by this time was running WEL's affairs, accepted service of process in Harold's action on behalf of both PCI-2 and WEL, but he did not take any action to defend either corporation in the case. In the adversary proceeding, William testified that he did not defend the corporations against the lawsuit "because there was no means [by] which even [to] try to defend it. There was no money." App. at 254.

Ultimately, Harold obtained default judgments in the state court against PCI-2 and WEL in the amounts of $1,107,550.09 and $1,204,439.12, respectively. Though William has contended otherwise, the Bankruptcy Court believed that Theresa was not aware of the case when Harold initiated the Berks County lawsuit and did become aware of it until late in 2004 after Harold obtained the judgments. She testified in the Bankruptcy Court that if she had known about Harold's lawsuit, she would have hired counsel separately to defend against it. This testimony seems credible because she had retained counsel to defend against Harold's earlier action.

On March 25, 2005, Harold commenced execution proceedings on his judgment against property that WEL owned on Reading Avenue in Boyertown, Pennsylvania, and on July 8, 2005, Harold purchased the parcel at a sheriff's sale.[5] He then

---

[5] Payne contends that the execution against the Reading Avenue property appropriated all of WEL's assets as he states that "[t]he sale [was of] WEL's only assets." Appellant's br. at 17.

8

resold the property for $345,000, and retained approximately $320,000 in net proceeds. Thus, his judgment was partially satisfied.[6]

C.    The Present Litigation

On August 6, 2008, by order of the Court of Common Pleas of Berks County, Orphan's Court Division, Payne

---

Therefore, according to Payne, Harold converted the assets of WEL to himself, leaving WEL "a worthless entity and an empty shell." Id. The Bankruptcy Court's findings that "WEL still owned other properties at this time" contradicts this contention. App. at 47. Overall the uncertainty as to the identification of WEL's assets makes it unclear what WEL was worth in March 2005 or the share of its assets that the Reading Avenue property constituted. It is, however, clear that L.L. through her ownership of WEL shares had a significant indirect financial interest in that property that its sale price demonstrated was valuable.

[6] We are treating the proceeds of the resale rather than the lesser amount for which Harold acquired the property at the sheriff's sale as a partial satisfaction of the judgment because Harold apparently regards the proceeds of the resale in that light. We are aware that arguably in a legal sense only the proceeds of the sheriff's sale itself should be treated as having satisfied the judgment but for purposes of this opinion it is immaterial which sale price is regarded as having partially satisfied the judgment.

9

succeeded Harold as custodian for L.L.'s shares in WEL.[7] After conducting an investigation, Payne concluded that Harold wrongfully deprived L.L. of the value of her shares when he sued WEL and secured a judgment against it and then obtained partial satisfaction of the judgment from a sale of its assets.

On October 24, 2008, Payne, as custodian for L.L.'s shares, commenced an action in the Berks County Court of Common Pleas against Harold, William, WEL, and other Lampe family businesses. This lawsuit included claims against Harold for breach of his fiduciary duties as the previous custodian for L.L.'s shares and as a WEL director, alleging that Harold engaged in self-dealing and other malfeasance when he sued WEL and secured partial satisfaction of the judgment that he obtained from the sale of its assets, particularly to the extent that it was PCI-2 that was the obligor on the debt owed Harold. Payne stated that Harold's allegation in his 2004 litigation that led to the judgment against WEL that WEL and PCI-2 were alter egos was a sham. He further contended that he could demonstrate that if the officers and directors of WEL had exercised reasonable care, they could have defended WEL successfully against Harold's case insofar as Harold sought to hold WEL liable for his loans to PCI-2. It is obvious that the recognition of WEL and PCI-2 as alter egos was significant for, as WEL's ownership of the Reading Avenue property demonstrated, WEL owned substantial assets, unlike PCI-2.

On December 4, 2008, less than two months after Payne

---

[7] The parties do not set forth the details of the proceedings leading to Payne's appointment as the custodian.

10

initiated his litigation, Harold filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court that automatically stayed Payne's Berks County litigation.[8] See 11 U.S.C. § 362. In his schedules in the bankruptcy case, Harold listed Payne as a creditor with a disputed claim in the amount of $345,000. On January 15, 2009, Payne filed an unsecured claim in the bankruptcy case for $500,000 and, on the same day, he commenced an adversary proceeding largely tracking his stayed Berks County action. The adversary complaint sought: (1) a judgment in the amount of $345,000 against Harold; (2) the allowance of a claim in the same amount based on the judgment that Payne sought; and (3) a determination that the debt underlying the claim was not dischargeable because Harold engaged in fraud or defalcation while acting in a fiduciary capacity. See 11 U.S.C. § 523(a)(4). Harold filed objections to Payne's proof of claim and contended that the claim was not entitled to be treated as prima facie valid under Federal Rule of Bankruptcy Procedure 3001(c) and (f). Harold predicated this contention on the circumstance that the proof of claim did not include any attachments or factual explanation for the claim other than a generalized allegation that Harold had engaged in "fraud and breach of fiduciary duties." App. at 48.

The Bankruptcy Court consolidated the adversary proceeding and Harold's objections to Payne's proof of claim and held a bench trial in the consolidated proceedings on April 9 and 12, 2010. On November 19, 2010, the Court issued an

---

[8] Payne unsuccessfully sought relief from the stay so that he could pursue the Berks County case.

opinion and order upholding Harold's objection to Payne's claim and entering judgment on the adversary complaint in Harold's favor.

At the threshold of its opinion, the Bankruptcy Court concluded that Payne's proof of claim was not entitled to prima facie validity as it agreed with Harold that Payne did not file documentation to establish his connection to Harold or to support the claim. The Court also noted:

> In any event, even if Payne's claim was given prima facie effect, the Court would rule in the same manner on the Objection. The Debtor [Harold] provided evidence which refutes Payne's contention that he breached his fiduciary duties. Moreover, there is no evidence that the debtor committed fraud.

App. at 50 n.28. In addressing the substance of the claim, the Bankruptcy Court framed the issues as follows:

> In order to find that Payne has a claim against the estate in the amount of $345,000, the Court must find, by a preponderance of the evidence, that: (i) [Harold] was the custodian of nine (9) shares of stock in WEL for his granddaughter, [L.L.]; and (ii) that [Harold] breached his fiduciary duty to [L.L.] in his role as a director of WEL or as the custodian for her of her WEL stock.

App. at 50. The Court determined that Harold was the custodian

12

for L.L.'s shares when he obtained the judgment that led to the sale of the Reading Avenue property and he was aware of the custodianship.[9] Harold does not challenge those findings on this appeal. The Court thereafter focused its discussion on the issue of whether Harold breached his fiduciary duties under Pennsylvania law.

The Bankruptcy Court began its breach of fiduciary duty analysis by noting that as a WEL director Harold owed the corporation[10] the familiar fiduciary duties of care and loyalty.

---

[9] In the Bankruptcy Court Harold argued that L.L. did not own the nine WEL shares because: (1) the Pennsylvania Uniform Gift to Minors Act did not exist when the shares were issued to her, (2) he did not consent to being the custodian for the shares, and (3) at relevant times William and Theresa held themselves out either as sole or co-equal shareholders of WEL. The Bankruptcy Court did not find any of these arguments persuasive and concluded that Harold was the custodian of the shares.

[10] Under Pennsylvania law, a director ordinarily owes his fiduciary duties to the corporation rather than to its individual shareholders. 15 Pa. Cons. Stat. Ann. § 517 (West 2011); see In re Insulfoams, Inc., 184 B.R. 694, 703 (Bankr. W.D. Pa. 1995). After noting that Harold did not object, the Bankruptcy Court accepted Payne's characterization of the adversary proceeding as a shareholder's derivative action. Accordingly, Payne stands in the shoes of WEL for purposes of his breach of fiduciary duties claim, and we must analyze the question of whether the corporation would have such a claim against

13

See 15 Pa. Cons. Stat. Ann. §§ 512(a), 1712 (West 2011); Anchel v. Shea, 762 A.2d 346, 357 (Pa. Super. Ct. 2000). Next, after stating that the test for liability for breach of fiduciary duty, but not distinguishing between the duties of care and loyalty, is whether a director was unjustly enriched by his actions, the Court concluded that Harold was not unjustly enriched by the sale of the Reading Avenue property and his retention of the proceeds of the sale because the Court believed that Harold's judgment was based on a legitimate claim against WEL. Thus, the Court indicated that "[i]n seeking a judgment against WEL for his loans and in executing on that judgment against real property which WEL owned, [Harold] exercised his right to obtain what he was validly owed." App. at 46. See Seaboard Indus., Inc. v. Monaco, 276 A.2d 305, 309 (Pa. 1971). Though the Court held that Harold also owed L.L. fiduciary duties under the Pennsylvania Uniform Transfers to Minors Act, see 20 Pa. Cons. Stat. Ann. § 5312 (West 2011), it concluded that he did not breach those duties because, as it held with respect to Harold's duties to WEL, he "exercised his right to obtain what he was validly owed." App. at 46. Thus, the Court entered an order dismissing Payne's adversary proceeding and upholding Harold's objections to Payne's proof of claim.[11]

---

Harold.

[11] Having granted the objection, the Bankruptcy Court did not address the issue of dischargeability under 11 U.S.C. § 523(a)(4) as there was no debt to discharge. We thus are perplexed by Payne's argument that "[t]he bankruptcy court and the district court erred in finding that [L.L.'s] claims against Harold were

14

Payne appealed to the District Court but it affirmed and in doing so adopted the Bankruptcy Court's reasoning. Payne then appealed to this Court.

### III.    JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157 and 1334, the District Court had jurisdiction under 28 U.S.C. § 158(a), and we have jurisdiction pursuant to 28 U.S.C. § 1291 and 28 U.S.C. 158(d). We exercise plenary review of the District Court's order and, like that Court, apply a clearly erroneous standard of review to the Bankruptcy Court's factual findings and review its conclusions of law de novo. In re Siciliano, 13 F.3d 748, 750 (3d Cir. 1994). In effect, we are reviewing the Bankruptcy Court's disposition of this case.

### IV.    DISCUSSION

A.    Burdens of Proof for an Objection to a Proof of Claim

---

dischargeable." Appellant's br. at 18. Though as a practical matter there may not be a difference between a holding that there is no debt as the Court held in the adversary proceeding, and a holding that a debt is dischargeable, they simply are not the same thing.

15

Payne argues that the Bankruptcy Court erred in holding that his proof of claim was not entitled to prima facie validity. We agree. "The burden of proof for claims brought in the bankruptcy court . . . rests on different parties at different times." In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992). Under section 502(a) of the Bankruptcy Code, a proof of claim "is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Bankruptcy Court Rule 3001(f) provides: "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and the amount of the claim." Therefore, a proof of claim that alleges sufficient facts to support liability satisfies the claimant's initial obligation to proceed, after which the burden shifts to the objector to produce sufficient evidence to negate the prima facie validity of the filed claim. Allegheny Int'l, 954 F.2d at 173-74. Nevertheless, the claimant always has the burden of persuasion in a contested proceeding. Id. at 174.

Payne takes issue with the Bankruptcy Court's conclusion that his proof of claim was subject to Bankruptcy Rule 3001(c). That rule provides:

> When a claim, or an interest in property of the debtor securing the claim, is based on a writing, the original or a duplicate shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim.

We agree with Payne that Rule 3001(c) was inapplicable to his claim inasmuch as he did not base the claim on a writing, but

16

rather advanced his claim on what are essentially state law tort principles. See Restatement (Second) of Torts § 874 (1979) ("One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation."). We reach this conclusion because even though we have not addressed comprehensively the meaning of "writing," and Rule 3001(c) does not define that term, courts have observed that the rule only applies when a writing created the purported obligation and is not applicable merely because a document might play some role in establishing the claim. See In Re Los Angeles Int'l Airport Hotel Assoc., 106 F.3d 1479, 1480 (9th Cir. 1997) ("Rule 3001(c) is invoked where the obligation itself, and not its consequent enforcement, is based upon a writing."); In re Fuller, 204 B.R. 894, 898 (Bankr. W.D. Pa. 1997) (holding that a claim based on an IRS tax lien was not "based on a writing," but rather on federal statutes).

Harold argues that Payne based his claim on multiple writings, including Payne's earlier state-court complaint, documents relating to the sheriff's sale of the Reading Avenue property, and the shareholder's certificate establishing Harold's custodianship for L.L.'s nine shares. While these documents have evidentiary value in establishing Payne's claim, they do not demonstrate that Harold engaged in unlawful conduct and we see no way to hold that they created Harold's obligation. If we adopted Harold's argument with respect to the scope of Rule 3000(c) we would subject every claim in which a writing could play any role to the requirements of that rule. The rule is meant to "provide the debtor with fair notice of the conduct, transaction, and occurrences that form the basis of the claim."

17

In re O'Brien, 440 B.R. 654, 662 (Bankr. E.D. Pa. 2010) (quoting In re Sandifier, 318 B.R. 601, 611 (Bankr. M.D. Fla. 2004)) (internal quotation marks omitted). Clearly, Harold had that notice. We are satisfied that within the context of Rule 3000(c) the writings here cannot be equated functionally to, for example, a promissory note on which a debtor is the obligor. Therefore, inasmuch as we conclude that Payne's proof of claim was not "based on a writing," he was not required to attach documentation to the claim, and thus his claim was entitled to prima facie validity. See In Re Los Angeles, 106 F.3d at 1480.[12]

### B. Harold's Duties as a WEL Director

Payne's next assertion of error is that the Bankruptcy Court erred in its determination that Harold did not breach his

---

[12] Although we conclude that Payne's claim was entitled to prima facie validity, even if we treated his claim as an ordinary civil complaint our result on this appeal would not differ from that we reach. Consequently, though we reach an opposite result on the merits of this case from that of the Bankruptcy Court, we follow its approach in not predicating its conclusion on a presumption when it explained that "even if Payne's claim was given prima facie effect, the Court would still rule in the same manner on the objection." App. at 50 n.28. We take this approach because though there are many facts in dispute in this case the facts that we regard as controlling are not in dispute and we are resolving the case through the application of legal principles. Thus, this case does not turn on the prima facie validity of Payne's claim.

18

fiduciary duties as a WEL director. "The basic federal rule in bankruptcy is that state law governs the substance of claims, Congress generally having left the determination of property rights in the assets of a bankrupt's estate to state law." Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20, 120 S.Ct. 1951, 1955 (2000) (internal citation and quotation marks omitted).

Section 512 of Pennsylvania's Business Corporation Law states:

> A director of a domestic corporation shall stand in a fiduciary relation to the corporation and shall perform his duties as a director . . . in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.

15 Pa. Cons. Stat. Ann. § 512(a); see also 15 Pa. Cons. Stat. Ann. § 1712(a). A director's duty of care requires him to "discharge duties to the corporation with the same diligence, care, and skill which ordinary prudent persons exercise in their personal affairs; failure to exercise such care renders any corporate director liable for resulting corporate losses." In re Main, Inc., 239 B.R. 281, 291 (Bankr. E.D. Pa. 1999). A director also owes a corporation a second duty, a duty of loyalty, which requires him in dealing with the affairs of the corporation to promote the interests of the corporation rather than his own interests. See Anchel, 762 A.2d at 357; Fitzpatrick v. Shay, 461 A.2d 243 (Pa. Super. Ct. 1983).

19

1.    Duty of Care

The Bankruptcy Court rejected Payne's claim predicated on Harold's alleged breach of his duty of care as it concluded that because Harold had not been unjustly enriched by his actions, he could not be liable on the basis of breach of fiduciary duty.  In this regard, the Court concluded that "the test for liability for breach of fiduciary duty is whether a director was unjustly enriched by his actions."  App. at 54.  We think, however, that the Court's conclusion misapplied Pennsylvania case law as we are satisfied that, although when there is a breach of fiduciary duty a culpable fiduciary well may have been unjustly enriched, the party charging the fiduciary with breach of duty need not always show that the fiduciary has been unjustly enriched by his conduct.

At the outset of our duty of care discussion we quote from a leading Pennsylvania Supreme Court decision in which that court focused on unjust enrichment.  We start at this point because, as we have indicated, the Bankruptcy Court believed that the absence of such enrichment was critical in this case.  In that decision, Bailey v. Jacobs, 189 A. 320 (Pa. 1937), the Supreme Court explained:

> Directors and officers occupy toward stockholders what is commonly characterized as a fiduciary relationship.  They must act in the utmost good faith, and cannot deal with the funds and property of the corporation, nor utilize the influence and advantage of their offices, for any but the common interest.  If they make a personal profit

20

> through the use of corporate assets, they must account for it to the stockholders. It is immaterial that their dealings may not have caused a loss or been harmful to the corporation; the test of liability is whether they have unjustly gained enrichment.

Id. at 324. Although after Bailey courts applying Pennsylvania law have continued to consider whether there has been unjust enrichment when certain breach of loyalty claims are advanced, the courts have not required a showing of unjust enrichment in every case involving the related but distinct claim of breach of fiduciary duty predicated on the fiduciary's lack of due care. See In re Main, 239 B.R. at 290 (holding that corporate directors breached their fiduciary responsibilities because they failed to show that the transactions were in the best interests of the company, without addressing whether those directors were unjustly enriched). It is logical that Bailey should not be applied in cases involving breach of care claims as that case dealt with the misappropriation of a business opportunity and a director certainly can breach his fiduciary duties including the duty of care by other conduct. Thus, well-established corporate law recognizes that a director can breach his duty of care by mismanaging a corporation to its detriment even though he does not obtain any benefit from his mismanagement. See Selheimer v. Manganese Corp. of Am., 224 A.2d 634, 647 (Pa. 1966) (holding directors liable to the corporation for losses caused by their "negligent and wasteful conduct" in expending undue corporate resources on an unprofitable manganese oxide plant).

Payne contends that Harold breached his duty of care as a

21

WEL director because he did not cause WEL to retain counsel and defend itself against his 2004 lawsuit that resulted in the judgment against WEL. Harold counters by invoking the business judgment rule. The business judgment rule, however, only insulates a director from liability for decisions made:

> (1) in good faith; (2) where the director or officer is not interested in the subject of the business judgment; (3) is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances; and (4) rationally believes that the business judgment in question is in the best interests of the corporation.

Viener v. Jacobs, 834 A.2d 546, 557 (Pa. Super. Ct. 2003). In this case, Harold undoubtedly was "interested in the subject of the business judgment" and was engaging in self-dealing conduct when he sought to satisfy his judgment from the assets of WEL and failed to take any steps to procure an attorney for WEL to defend against his suit. Accordingly, the presumption afforded by the business judgment rule does not apply to his actions in this case. See 15 Pa. Cons. Stat. Ann. § 1716(b) (West 2011) ("Absent breach of fiduciary duty, breach of good faith or self-dealing, actions taken as a director shall be presumed to be in the best interests of the corporation.").

After considering the facts of the case, including the Bankruptcy Court's findings of historical facts, which we accept, we hold that Harold breached his duty of care as a WEL

22

director.[13] Our conclusion does not depend on a showing that he was unjustly enriched at WEL's expense though, in fact, as we will explain, that may have been the case. Harold protests that he did not shoulder the duty to defend WEL alone, and that William could have hired an attorney to defend it.[14] Even if this is so, William's duties as a WEL director are not at issue here; Harold had a duty of care independent of any duty William owed with respect to WEL. See Seaboard Indus., 276 A.2d at 309 ("[D]irectors and officers of a corporation are jointly as well as severally liable for mismanagement, willful neglect or misconduct of corporate affairs . . . ."). Though it might seem

---

[13] We are aware that the Bankruptcy Court indicated that Harold "was, by far, the most credible and convincing witness." App. at 18. Though the record can be read to support a conclusion that in one important respect Harold's testimony might not have been completely credible, see supra note 4 and the accompanying text, we nevertheless will accept the Court's assessment but that assessment does not affect our result.

[14] Though, as we noted above, William contended otherwise, the Bankruptcy Court believed that Theresa, although also a WEL director, did not find out about the 2004 lawsuit and default judgment until late 2004. Thus, she could not have defended WEL in the case when Harold filed it, though she might have sought to reopen the case when she became aware of it after the judgment was entered. However, to the best of our knowledge she did not take any action to challenge the judgment he obtained. But, as we have indicated with respect to William's inaction, that circumstance does not absolve Harold from liability as he owed an independent duty of care to WEL.

23

odd that Harold should have been expected to take steps to defend against a lawsuit that he initiated, he was obligated to do exactly that at least to the extent of attempting to obtain an attorney to represent WEL in the case. See 15 Pa. Cons. Stat. Ann. § 512(a) (a director must discharge his duties after "reasonable inquiry," and must exercise "reasonable . . . skill and diligence."). Nevertheless, Harold made no effort to have WEL obtain an attorney to attempt to stave off a default judgment against WEL of over $1 million and he did nothing to ensure that WEL's interests were represented at the sheriff's sale of the Reading Avenue property.

Under Pennsylvania law, a director is liable to the corporation for breaching his duty of care for "losses which were proximately caused by the negligent and wasteful conduct" at issue. See Selheimer, 224 A.2d at 647. Proximate causation is defined as "a wrongful act which was a substantial factor in bringing about the plaintiff's harm." Dudley v. USX Corp., 606 A.2d 916, 923 (Pa. Super. Ct. 1992) (citations omitted), see Restatement (Second) of Torts § 431 (1965). Whatever the merits of Harold's 2004 lawsuit, he did nothing to protect WEL's interests either in connection with the lawsuit or the sale of the Reading Avenue property.[15] Though we cannot be certain

---

[15] Harold implies that the Rooker-Feldman doctrine forecloses any inquiry into the 2004 litigation. That doctrine "is implicated when, in order to grant the federal plaintiff the relief sought, the federal court must determine that the state court judgment was erroneously entered or must take action that would render that judgment ineffectual." See In re Madera, 586 F.3d 228, 232 (3d Cir. 2009) (internal quotation marks omitted). However, the

of what the outcome would have been if an attorney had defended WEL against Harold's action, we see no escape from the conclusion that, by permitting a default judgment to be entered against WEL on which there was execution, Harold contributed to the reduction of the value of the corporation.[16] We reach our conclusion even though we accept the Bankruptcy Court's finding that Harold by his lawsuit was seeking to recover a valid debt on which he was the obligee. In this regard, we point out that the shortfall in the Bankruptcy Court's finding is that it did not establish that WEL owed that the entirety of that debt to Harold or that PCI-2 and WEL were alter egos.[17]

---

Rooker- Feldman doctrine is "narrow" and "applies only in limited circumstances." Lance v. Dennis, 546 U.S. 459, 464-66, 126 S.Ct. 1198, 1201-02 (2006) (internal quotation marks and citations omitted). The Rooker-Feldman doctrine does not apply when—as is the case here—a plaintiff asserts an independent violation of his rights that does not turn on the correctness of a state-court judgment. See In re Madera, 586 F.3d at 232.

[16] We are not oblivious to the reality that as a practical matter directors of large corporations cannot be expected to have day-by-day responsibility for managing the corporate affairs. Here, however, we are dealing with a closely held family corporation with few shareholders and our statements as to Harold's responsibility with respect to the defense of his case should be understood in that context.

[17] The Bankruptcy Court believed that because funds were intermingled between PCI-2 and WEL Harold had "a good faith

2.	Duty of Loyalty

A director's duty of loyalty necessitates that he not engage in self-dealing.  Directors must advance "the common interests and not their own; they cannot directly or indirectly, utilize their position to obtain any personal profit or advantage other than that enjoyed also by their fellow shareholders." Tyler v. O'Neill, 994 F. Supp. 603, 612 (E.D. Pa. 1998).  Pennsylvania law in 15 Pa. Cons. Stat. Ann. § 1728 (West 2011) spells out a statutory explanation of the duty of loyalty:

> (a) General rule.  A contract or transaction between a business corporation and one or more of its directors or officers or between a business corporation and another domestic or foreign corporation for profit or not-for-profit, partnership, joint venture, trust or other enterprise in which one or more of its directors or officers are directors or officers or have a financial or other interest, shall not be void or voidable solely for that reason, or solely because the director or

---

basis" for his allegations that "WEL should be held liable for his loans" to PCI-2, app. at 5, that because of the siphoning of funds Harold "acted within his right in seeking repayment of his loans from WEL," app. at 57, and that Harold "had reasonable grounds for asserting his claim in state court to have WEL held liable for these loans."  App. at 59.  We accept these findings but they are not dispositive because they do not establish that WEL could not have successfully advanced a defense to Harold's claim.

26

officer is present at or participates in the meeting of the board of directors that authorizes the contract or transaction, or solely because his or their votes are counted for that purpose, if:

> (1) the material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors and the board authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors even though the disinterested directors are less than a quorum;

> (2) the material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon and the contract or transaction is specifically approved in good faith by vote of those shareholders; or

> (3) the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the board of directors or the shareholders.

Harold addressed section 1728 by contending that his defense does not depend on a showing that its demanding requirements were satisfied. Rather, he contends that his

27

acquisition of the Reading Avenue property did not constitute a "contract or transaction" subject to that law. Appellee's br. at 46. Though we do not take a position on the question of whether section 1728 is a complete statement of a director's duty of loyalty,[18] we think that, in substance, Harold's purchase and resale of the property was a "transaction" subject to section 1728 and the common law's exacting scrutiny of self-dealing. Neither of the requirements that section 1728(a)(1) or (a)(2) sets forth has been met in this case, and Harold's acquisition of the Reading Avenue property could not have been fair to WEL as it arose out of a default judgment in an action against WEL which it never defended. See In re Athos Steel and Aluminum, Inc., 71 B.R. 525, 541 (Bankr. E.D. Pa. 1987) (when a plaintiff makes a prima facie showing that the director has a self-interest in a transaction, the director must show that the transaction is intrinsically fair to the corporation).

It is clear that Harold by not taking any steps to assist WEL in avoiding a default in a case in which he took actions that resulted in the sheriff's sale of the Reading Avenue property, in the words of Tyler v. O'Neill, used his "position to

---

[18] In Warehime Enterprises, Inc. v. Warehime, 731 A.2d 128 (Pa. 1999), the Pennsylvania Supreme Court granted allocatur on the issue of whether section 1728 "defines the outer limits of a director's fiduciary duties of care, good faith and/or loyalty in connection with an interested transaction which the director knows will result in unfairness or fraud to the corporation." Ultimately, however, the court did not reach this issue. Warehime v. Warehime, 761 A.2d 1138 (Pa. 2000).

28

obtain . . . personal profit or advantage other than that enjoyed also by their fellow shareholders." 994 F. Supp. at 612. Although WEL may have been indebted to Harold, he contributed to depriving WEL of a substantial asset, perhaps unjustifiably as he acquired the Reading Avenue property for himself to its detriment.[19] Accordingly, Harold breached his duty of loyalty to WEL.

As a general rule, "the conduct forbidden in the acquisition of interests adverse to the corporation is the realization of a profit," see Weissman v. A. Weissman, Inc., 114 A.2d 797, 799 (Pa. 1955), and Pennsylvania courts often have used the concept of unjust enrichment as a measure of liability in this context. See Seaboard Indus., 276 A.2d at 309.[20] Thus,

---

[19] In his May 28, 2004 complaint Harold alleged that he had lent $31,000 to WEL and that $65,880.93 interest had accrued on that loan. Harold's recovery from the sale of WEL's property to satisfy in part the Berks County judgment far exceeded the sum of those that amounts and thus it would be difficult to argue that his wrongful actions merely eliminated WEL's debt even without regard to the alter ego theory that Harold advanced in the Berks County litigation.

[20] In CST, Inc. v. Mark, 520 A.2d 469, 472 (Pa. Super. Ct. 1987), the Superior Court of Pennsylvania noted that unjust enrichment is the standard test for corporate fiduciary liability, but affirmed the trial court's holding that a director breached his duty of loyalty where the breach "had been a substantial factor" in bringing about harm to the corporation even though the director was not unjustly enriched. We have noted already that

although as we have explained, a director may breach his duty of due care without being unjustly enriched, a showing of unjust enrichment still may be significant in a case involving a claim of breach of fiduciary duties, particularly when the duty is of loyalty. A showing of unjust enrichment requires a demonstration that: (1) a benefit was conferred on the defendant; (2) the defendant retained that benefit; and (3) it would be inequitable for the defendant to retain the benefit without paying full value for it. Schenck v. K.E. David, Ltd., 666 A.2d 327, 328 (Pa. 1995). But there is not a rigid formula that can be applied in a determination of whether there has been unjust enrichment as that determination "depends on the unique factual circumstances of each case." Safe Auto Ins. Co. v. Berlin, 991 A.2d 327, 336 n.6 (Pa. Super. Ct. 2010). In this case, it is clear that by securing the judgment, executing on it, acquiring the Reading Avenue property at the sheriff's sale, reselling the property, and personally taking the proceeds from the resale Harold obtained a benefit that he kept. Considering all the circumstances of this case we are satisfied that it was inequitable for Harold to retain the proceeds from the Reading Avenue property resale in the light of the duty of loyalty that he owed WEL.

C.      Harold's Duties as Custodian for L.L.'s Shares

Pennsylvania law is not so rigid as to require unjust enrichment in every case charging liability on the basis of a breach of corporate fiduciary duty. See Selheimer, 224 A.2d at 647. Here, Harold was on both sides of a transaction that was detrimental to WEL. This conflict of interests is sufficient for us to hold that Harold breached his duty of loyalty to WEL.

30

The Pennsylvania Uniform Transfers to Minors Act ("PUTMA") is the successor legislation to the Pennsylvania Uniform Gifts to Minors Act ("PUGMA"), and "provide[s] an inexpensive, easy way for giving property to minors."[21] Sternlicht v. Sternlicht, 822 A.2d 732, 737 (Pa. Super. Ct. 2003). Under the PUTMA, a "person may make a transfer by irrevocable gift to . . . a custodian for the benefit of a minor pursuant to section 5309 . . . ." 20 Pa. Cons. Stat. Ann. § 5304 (West 2011). The custodian must manage the minor's property and its proceeds until the minor reaches the age of 21 years. 20 Pa. Cons. Stat. Ann. § 5320 (West 2011). Under 20 Pa. Cons. Stat. Ann. § 5309 (West 2011), a property may be held by a custodian when it is "registered in the name of the transferor . . . followed in substance by the words, 'as custodian for (name of minor) under the Pennsylvania Uniform Transfers to Minors

---

[21] A transfer of ownership of a security to a minor under the PUTMA allows parents and others to make transfers to minors without complex legal arrangements such as creating a trust or a guardianship. The PUTMA also preserves certain federal tax benefits to the donor. See Sutliff v. Sutliff, 528 A.2d 1318, 1323 (Pa. 1987) (discussing the PUGMA). We recognize that the transfer to Harold as custodian was recited to be made under the PUGMA even though at the time of the transfer the PUTMA had replaced the PUGMA. We nevertheless are applying the PUTMA because the notes to 20 Pa. Cons. Stat. Ann. § 5301 (West 2011), the title and definition section of the PUTMA, indicate that when the PUTMA was enacted the enacting legislation provided that it would apply to transfers after its effective date even though the transfers purport "to have been made under the [PUGMA.]"

31

Act' . . . ." 20 Pa. Cons. Stat. Ann. § 5309(a)(1)(i). "Whatever its source, custodial property that is held pursuant to Section 5304 is the property of the minor child." Sternlicht, 822 A.2d at 737. In managing property for a minor's benefit, "a custodian may deliver or pay to the minor or expend for the minor's benefit so much of the custodial property as the custodian considers advisable for the use and benefit of a minor, without court order . . . ." 20 Pa. Cons. Stat. Ann. § 5314(a) (West 2011).

The PUTMA further provides:

In dealing with custodial property, a custodian shall observe the standard of care that would be observed by a prudent person dealing with property of another and is not limited by any other statute restricting investments by fiduciaries. If a custodian has a special skill or expertise or is named custodian on the basis of representations of a special skill or expertise, the custodian shall use that skill or expertise.

20 Pa. Cons. Stat. Ann. § 5312(b) (West 2011). The PUTMA also imposes a duty of loyalty: "A custodian may not use PUTMA property to benefit himself." Sternlicht, 822 A.2d at 740. Thus, the duties owed by a custodian to a minor track those owed by a director to his corporation.

1. Duty of care

The Bankruptcy Court's conclusion that Harold did not violate his duties as a PUTMA custodian rested on two bases.

32

First, the Court, not distinguishing between a duty of care and a duty of loyalty, concluded:

> In seeking a judgment against WEL for loans and executing on that judgment against real property which WEL owned, [Harold] exercised his right to obtain what he was validly owed. In doing so, he did not deprive [L.L.] of her nine shares of stock in WEL nor of any assets to which WEL was legally entitled.

App. at 59. Second, the Bankruptcy Court concluded that William and Theresa, being "well aware at the time of the gift to L.L. that [Harold] was owed money from WEL," waived on L.L.'s behalf any conflict of interest existing between Harold and L.L. Id. In considering Harold's duty of care as a custodian we pass directly to the Court's conclusion with respect to waiver inasmuch as the Court's first basis for its conclusion cannot survive with respect to the duty of care for the same reasons that we have held that Harold breached his duty of care to WEL as a director.

The Bankruptcy Court's finding of waiver cannot support its decision. The PUTMA does not contemplate waivers of conflicts of interest on the minor's behalf, at least in a situation like that here where the waiver cannot possibly benefit the minor.[22] Rather, a transfer under the PUTMA "is irrevocable,

---

[22] We are not suggesting that there never can be a situation in which a custodian's conflict of interest with respect to dealing with custodial property can be waived. After all, a waiver of the

and the custodial property is indefeasibly vested in the minor, but the custodian has all the rights, powers, duties and authority provided [under the PUTMA], and neither the minor nor the minor's legal representative has any right, power, duty, or authority with respect to custodial property except as provided [under the PUTMA]." 20 Pa. Cons. Stat. Ann. § 5311(b) (West 2011); see 20 Pa. Cons. Stat. Ann. § 5301 (West 2011) (defining "legal representative" as "[a]n individual's personal representative or guardian."). The PUTMA vests extensive management powers and duties in the custodian, and does not provide or imply that a minor's parents may ratify a custodian's decisions that may be adverse to the minor's interests. See 20 Pa. Cons. Stat. Ann. §§ 5312, 5313, 5314.

## 2. Duty of Loyalty

In considering this case it is important to emphasize that just as Harold owed a duty of loyalty to WEL as a director, he owed L.L. a duty of loyalty under the PUTMA. In considering whether Harold acted consistently with this duty we recognize that, as he points out, he did not do what the PUTMA clearly proscribes: converting L.L.'s shares or selling them and

conflict might be in a minor's interest as, for example, if the custodian is seeking to purchase for himself custodial property for a price far exceeding its market value. In that situation a minor well might benefit if the custodian personally brought the property and invested the proceeds from the sale in more valuable assets. Perhaps in such a case the custodian could seek authority to acquire the property from a court with jurisdiction over such an application.

34

appropriating the proceeds. Thus, this case differs from cases such as In re Gumpher, 840 A.2d 318, 323 (Pa. Super. Ct. 2003), in which the court held that a mother's actions in liquidating a child's PUTMA account for the mother's immediate benefit was a breach of her custodial responsibilities. However, as Payne observes, "[t]he stock of WEL has no inherent value. It has value only to the extent that WEL owns assets and generates income." Appellant's br. at 27. Thus, shares of stock cannot be viewed as simply sheets of paper or notations in computer records. Consequently, Harold had not only a duty to look after the shares themselves, but also not to do anything that would reduce their value to L.L.'s detriment.

On this point, we find the Supreme Judicial Court of Massachusetts' decision in Fogelin v. Nordblom, 521 N.E.2d 1007 (Mass. 1988), to be instructive.[23] In Fogelin, two custodians held 82% of preferred shares of a business trust that were given to minors under the Massachusetts version of the Uniform Gifts to Minors Act. After its establishment, the trustees executed an amendment to the trust that greatly diminished the liquidation value of the proposed shares. On a

---

[23] Given the paucity of case law under the PUTMA, which we observe is a happy state of affairs, Pennsylvania courts look to cases decided in other jurisdictions under their versions of the Uniform Transfers to Minors Acts and its predecessor, the Uniform Gifts to Minors Act, for guidance. See In re Gumpher, 840 A.2d at 322; 1 Pa. Cons. Stat. Ann. § 1927 (West 2011) ("Statutes uniform with those of other states shall be interpreted and construed with their general purpose to make uniform the law of those states which enact them.").

challenge to this action, the Supreme Judicial Court held that the custodians breached their custodial duties by consenting to the dramatic reduction in the value of the shares . Here, as in Fogelin, the circumstance that after the sale of the Reading Avenue property the minor retained ownership of the shares in WEL does not excuse Harold's conduct. Payne asserts—and Harold does not dispute—that the sale of the Reading Avenue property greatly reduced the value of WEL and thus the value of L.L.'s shares in that corporation.

Harold's role as the custodian for L.L.'s shares conflicted with his personal interest in recovering monies WEL owed him, and Harold's entitlement to payment from WEL did not absolve him of his duty to manage the nine shares for L.L.'s benefit. The Bankruptcy Court's conclusion that Harold did not breach his fiduciary duties because he was "validly owed" money by WEL only underscores the existence of his conflict of interest.

Harold's appropriation of L.L.'s property involved multiple steps: (1) suing WEL; (2) not taking steps on behalf of WEL to defend against the suit; (3) commencing execution proceedings; (4) purchasing the property; and (5) reselling it and retaining the proceeds. Though Harold well may have been justified in instituting his action against WEL, clearly he breached his custodial duty of loyalty to L.L. by his actions with respect to the other four steps involved in his appropriation of the property. A custodian's duties under the PUTMA are "analogous to those of a trustee with the broadest possible discretionary powers," who "owes a fiduciary duty to the beneficiary." See Sutliff v. Sutliff, 528 A.2d 1318, 1323 (Pa. 1987) (discussing the PUGMA). He "violates that duty when he

has a personal interest in trust dealings that might affect his judgment." Id. (citing Restatement (Second) of Trusts § 170, cmts. b, c (1959)). Though a custodianship is a different legal entity than a trust, we believe comment b to section 170(1) of the Second Restatement of Trusts is applicable to the facts here[24]:

> A trustee with power to sell trust property is under a duty not to sell to himself either by private sale or at auction, whether the property has a market price or not, and whether or not the trustee makes a profit thereby. It is immaterial that the trustee acts in good faith in purchasing trust property for himself, and that he pays a fair consideration.

> The trustee cannot properly purchase trust property for himself even though he does not make the sale. Thus, he cannot properly purchase

---

[24] Though we are treating the comment as applicable here, we cannot help but wonder whether it overstates what should be the constraints on the conduct of a trustee. See supra note 22. After all, there could be a situation in which local zoning laws coupled with a trustee's personal ownership of property adjacent to the trust property would preclude anyone other than the trustee from making use of the property he holds in trust. Thus, while the Restatement sets forth a bright-line rule, always much appreciated by judges and attorneys because of its certainty and easy application, in practice perhaps there should be limitations on it. But in this case we are not concerned with such a situation in which it would be unwise to apply the Restatement rule.

trust property for himself on a foreclosure sale or tax sale or sale on execution of a judgment. To permit him to do so would create a situation where his personal interest would be in conflict with his duty as trustee. It is his duty as trustee to prevent the sale if possible or to see that the property is sold for as much as can be obtained. If he were permitted to bid in the property for himself at the sale, it would be for his personal advantage not to prevent the sale and to have as few bidders and as low bids as possible. The trustee who bids in the property for himself at such a sale is not permitted to keep the property, even though in the particular case he attempted to secure as many bidders and as high bids as he could and the amount which he bid was a fair consideration for the property.

When Harold acquired and sold the Reading Avenue property, he effectively appropriated L.L.'s assets. Inasmuch as there was at least a dispute as to the validity of his claim against WEL, he violated his duty of loyalty to L.L. by his self-dealing actions.[25] As the Pennsylvania Supreme Court has stated,

---

[25] As we have indicated Payne has contended that WEL had a defense against Harold's Berks County action. Though we are taking note of Payne's contention we are not implying that if Harold's claim against WEL was not disputed, our result would be different as we do not reach that issue because we are dealing with a disputed claim. In this regard, we point out that the Pennsylvania courts at this late date almost certainly would not

38

"[w]here there is self-dealing on the part of a fiduciary, it is immaterial to the question of his liability in the premises whether he acted without fraudulent intent or whether the price received for his sale of trust property was fair and adequate." In re Noonan's Estate, 63 A.2d 80, 84 (Pa. 1949).[26]

## V.     CONCLUSION

For the foregoing reasons, we will reverse the order of the District Court entered March 9, 2011, and remand the case to that Court.[27]  Unless that Court retains the case it should further

---

rerun the course in Harold's 2004 lawsuit and determine who would have prevailed if WEL had defended against that case.  In any event, Harold does not request that somehow they be given that opportunity.

[26] As we indicated above, it is conceivable that in some circumstances there could be a waiver of a custodian's conflict of interest so that he could acquire the custodial property, but this is not such a case.  See supra note 24.

[27] In its opinion the Bankruptcy Court, after acknowledging that some of Harold's "statements were self-serving," stated that:

> What came across vividly to this Court was that this is a gentleman who supported the business endeavors of his son and daughter-in-law by providing loans to start up and then keep the

39

remand the case to the Bankruptcy Court for further proceedings. Regardless of whether the District Court or the Bankruptcy Court takes jurisdiction on the remand the proceedings should be consistent with this opinion. Inasmuch as we have determined that Harold breached his duties as a WEL director and as a custodian for L.L.'s shares, we leave it to the District Court or the Bankruptcy Court, as the case may be, on remand to determine the relief to which Payne is entitled on his claim and the issue of dischargeability of Payne's claim in Harold's bankruptcy proceedings.

---

business going, who after patiently waited to be repaid for the loans and who was finally forced to take action to be repaid when it because clear that was the only way that it was going to happen.

App. at 18-19. We do not disagree with what the Court said, but the problem is that Harold obtained his partial satisfaction of his judgment in the state-court action at the expense of L.L. and she was not the cause of his problems.

40